Wendell BILLS et al.,
Plaintiffs–Appellants,

v.

Murray HENDERSON et al.,
Defendants–Appellees.

No. 78–1172.

United States Court of Appeals,
Sixth Circuit.

Argued April 2, 1980.

Decided Oct. 1, 1980.

Rehearing Denied Nov. 13, 1980.

Robert A. O'Connell, Knoxville, Tenn., Carol S. Nickle, Dept. of Interior, Knoxville, Tenn., for plaintiffs–appellants.

Brooks McLemore, Atty. Gen., Henry E. Hildebrand III, Patricia J. Cottrell, Asst. Attys. Gen., Nashville, Tenn., for defendants–appellees.

Before EDWARDS, Chief Judge, and WEICK and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiffs, inmates at Brushy Mountain State Prison in Tennessee, filed this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief, alleging that procedures used in disciplinary proceedings at Brushy Mountain violated their right to due process under the fourteenth amendment of the Constitution. They appeal the District Court's judgment which granted only partial relief. Plaintiffs claim that the procedures followed when placing them in administrative segregation, punitive segregation, and in revoking their accrued good and honor time abridge their due process rights both by failing to comply with the minimal due process requirements set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and by failing to comply with the procedural requirements of the rules and regulations of the Tennessee Department of Correction.

The District Judge held that the plaintiffs had protected liberty interests in good and honor time and in not being placed in punitive segregation and the plaintiffs were denied their due process rights to the extent that they were deprived of those liberty interests without the due process requirements set forth in *Wolff v. McDonnell, supra*. He ruled that plaintiffs had no protected liberty interest requiring a hearing on transfer to administrative segregation. The judge further held that procedural regulations issued by the Tennessee Department of Correction created no protected liberty interests and that the due process clause did not therefore require that Tennessee adhere to its own procedural regulations in connection with the transfer of

prisoners to punitive or administrative segregation. *Bills v. Henderson,* 446 F.Supp. 967 (E.D.Tenn.1978).

## I.

■ We first address the question of whether plaintiffs have a protected liberty interest that requires certain due process standards be met prior to a transfer to administrative segregation.[1] The first question that must be answered in an analysis of this type is whether the interest claimed by plaintiffs is a life, liberty or property interest within the meaning of the due process clause. *Walker v. Hughes,* 558 F.2d 1247, 1250 (6th Cir. 1977); *Meachum v. Fano,* 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976). Plaintiffs claim a liberty interest in freedom from transfer to administrative segregation. It is clear that the due process clause of the Constitution does not, of itself, make a state prisoner's freedom from transfer to administrative segregation a protected liberty interest.

> As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

*Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). *See also Walker v. Hughes, supra,* 558 F.2d at 1252.

■ A protected liberty entitlement can also be created by state law, however. When a liberty interest has been created, the due process clause acts to insure that the state–created right is not arbitrarily abrogated. *Meachum v. Fano, supra,* 427 U.S. at 226, 96 S.Ct. at 2539. *Wolff v.*

*McDonnell, supra,* 418 U.S. at 557, 94 S.Ct. at 2975. *See Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980). Liberty interests can be created by state rules or mutually explicit understandings as well as by statute. In the area of liberty entitlements claimed by prison inmates, this Court has explicitly ruled that liberty interests can be created by policy statements and other promulgations by prison officials. *Walker v. Hughes, supra,* 558 F.2d at 1255.

■ Consequently, this Court must determine whether state statutes, mutually explicit understandings, or rules, including prison policy statements or other promulgations, created for plaintiffs a liberty entitlement or expectation that they would not be transferred to administrative segregation except upon the occurrence of specific events. *E. g., Wolff v. McDonnell, supra,* 418 U.S. at 557, 94 S.Ct. at 2975 (state–created right to "good time" credit by statute which specified that it would only be forfeited based on serious misbehavior); *Montanye v. Haymes, supra,* and *Meachum v. Fano, supra* (inmates had no due process rights to a hearing prior to transfer to another state prison where living conditions were substantially less favorable in the absence of a state law or practice conditioning such transfers on proof of serious misconduct or the occurrence of other specific events); *Walker v. Hughes, supra,* 538 F.2d at 1256 (federal inmates had due process rights not to have segregation, transfer to other prisons, forfeiture of good time credits, or loss of privileges imposed on them absent a finding of major misconduct, based on prison policy statement indicating that these sanctions would not be imposed absent such a finding by an adjustment committee). In determining whether such an expectation exists, the Court must focus on

---

1. Administrative segregation in Tennessee involves the transfer of a prisoner from 'general population' to a segregated unit which is the size of a standard cell. The inmate is entitled the same personal property as inmates in general population except that security razors are provided and items packaged from the commissary in glass or mailable [sic] metal are restricted. Mail privileges, diet and medical care are

unrestricted except that inmates in segregation eat in their cells and sick call is conducted in the inmate's cell by medical technicians. Daily exercise is restricted as to time and area and may also be restricted by inclement weather. Visitation is restricted to a 'secure visiting room' provided for segregated inmates. *Adult Service Policies and Procedures Manual of the Department of Correction,* Rule 4.650.

the nature of the interest rather than on its weight. *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979); *Meachum v. Fano, supra*, 427 U.S. at 223–24, 96 S.Ct. at 2537–38; *Walker v. Hughes, supra*, 558 F.2d at 1251–52. The plaintiffs must have a legitimate claim of entitlement to the interest, not simply a unilateral expectation of it. *Greenholtz v. Nebraska Penal Inmates, supra*, 442 U.S. at 7, 99 S.Ct. at 2104; *Walker v. Hughes, supra*, 598 F.2d at 1251.

Rule 4.602 of the *Adult Service Policies and Procedures Manual of the Department of Correction* (Guidelines) sets forth the purposes of administrative segregation and some of the guidelines to be used in imposing it.

> *Administrative Segregation.* Administrative Segregation will be implemented by transferral of the inmate to the adjustment center for an indeterminate period of time. *The purpose of administrative segregation is to provide a place of maximum custody to protect an individual, others, and to promote and maintain order.* Administrative segregation is recommended for those men with serious problems of maladjustment, mental illness or sexual abnormality to the degree that their safety or the safety of others is threatened in their normal day to day station.

Rule 4.602 (emphasis supplied).

The question here is whether this section of the rule created a protected expectation that plaintiffs would not be transferred to administrative segregation absent a finding that such transfer was necessary to protect that individual or others or to maintain order or that the transfer was based on problems such as serious maladjustment, mental illness, or sexual abnormality.

There are two lines of cases dealing with similar problems which assist in determining the answer to this question. First, there are cases dealing with the analogous condition of punitive segregation. In *Walker v. Hughes, supra*, 538 F.2d at 1256, this Circuit ruled that a prison policy statement indicating that sanctions such as segregation, transfers to other prisons, forfeiture of good time credits, and loss of privileges could not be imposed absent a finding by an adjustment committee of major misconduct, created an expectation interest in the prisoners that those sanctions would not be imposed in the absence of such a finding. This Court ruled that the fact that these policy statements were created and could therefore be changed by the Bureau of Prisons did not preclude the existence of a protected interest because executive officials cannot create a liberty interest and then provide procedural protections beyond the review of the courts. *Walker v. Hughes, supra*, 558 F.2d at 1254. The District Court made a similar ruling in the instant case with regard to punitive segregation. *Bills v. Henderson, supra*, 446 F.Supp. at 973. *See also Wolff v. McDonnell, supra*, 418 U.S. 544–58, 94 S.Ct. 2969–76; *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

The other line of cases deals with regulations regarding transfer of inmates to other prisons which leave the matter entirely within the discretion of prison officials and which provide no guidelines regarding transfer. In *Meachum v. Fano, supra*, and *Montanye v. Haymes, supra*, the Supreme Court ruled that no expectation or protected liberty interest was created by a statute which allowed prison officials the discretion to transfer prisoners for any reason, not limited to instances of serious misconduct. This was held to be true even though decisions to transfer might often be based on instances of misconduct and even though misconduct might have prompted the decision to transfer in an individual case. *Meachum v. Fano, supra*, 427 U.S. at 228, 96 S.Ct. at 2540. *Montanye v. Haymes, supra*, 427 U.S. at 243, 96 S.Ct. at 2547. The Court noted that decisions by prison officials under the statute would often involve no more than "informed predictions as to what would best serve institutional security or the safety and welfare of the inmate". *Meachum v. Fano, supra*, 427 U.S. at 225, 96 S.Ct. at 2538.

■ The demarcation between these two lines of cases is fairly clear. Where stat-

utes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits or favorable living conditions enjoyed by a prisoner, an expectation or entitlement has been created which cannot be taken away without affording the prisoner certain due process rights. On the other hand, when prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created. It is equally clear that the instant case does not fall easily into either of these situations. The Guidelines in this case give prison officials wide discretion in making what is essentially a predictive decision on what would serve the best interests of the institution and the individual. On the other hand, the Guidelines, by specifically outlining the purpose of administrative segregation and recommending the general situations in which it would be appropriate, seek to set the bounds within which that discretion is to be exercised.

The District Court held that the discretion retained by the Warden and the Disciplinary Board in imposing administrative segregation is so broad that no liberty expectations or due process rights were created in the plaintiffs. Since the date of the District Court's opinion, however, additional decisions in the area of procedural due process for prisoners indicate that the discretion of the prison officials in this case was sufficiently restricted to create a liberty expectation.

The most persuasive case in support of the creation of such a liberty expectation is *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976), aff'd, 343 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756. In that case, the District Court held that a prison policy statement created a protected expectation that a prisoner would not be transferred to adminis-

trative segregation unless he was found, for clearly documented reasons, to come within its standards. The policy statement in *Enomoto* was very similar to the one in the instant case.[2] The Supreme Court recognized that limited restrictions on prison officials' discretion, such as the ones present in *Enomoto*, create a very different situation from the unbridled discretion which was present in *Meachum v. Fano, supra*, and *Montayne v. Haymes, supra*.

Following *Meachum v. Fano* and *Montayne v. Haymes*, we continue to recognize that state statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement for disciplinary or administrative reasons. *Enomoto v. Wright*, 434 U.S. 1052 (1978), aff'g 462 F.Supp. 397 (N.D.Cal.1976).

*Vitek v. Jones, supra*, 445 U.S. at 489, 100 S.Ct. at 1261.

In both the instant case and *Enomoto*, the discretion of prison officials was limited by guidelines specifying that transfers to administrative segregation should take place for the safety and security of inmates or of the institution in general. We see no distinction between the prison guidelines in the instant case and the prison guidelines in *Enomoto* which were found to create a due process right.

■■■■ This conclusion is reinforced by the decision in *Greenholtz v. Nebraska Penal Inmates, supra*. In that case, the Court found that Nebraska's discretionary parole statute created an expectation which entitled potential parolees to some measure of constitutional protection. *Greenholtz, supra*, 442 U.S. at 12, 99 S.Ct. at 2106. *Greenholtz* made it clear that protected liberty interests may be created even when the prerequisite which limits the discretion of prison officials is a "predictive judgment"

---

**2.** § 3330. General Policy. (a) Inmates must be segregated from others when it is *reasonably* believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons. *The reason for ordering segregated housing must be clearly*

*documented by the official ordering the action at the time the action is taken.*
*Wright v. Enomoto, supra*, 482 F.Supp. at 403 (footnotes omitted) (emphasis added).

The Guidelines in the instant case contains a similar documentation requirement. *See* n. 7, *infra*.

based on certain guidelines rather than a specific factual finding. *Greenholtz, supra,* 442 U.S. at 9–10, 99 S.Ct. at 2104–05. Consequently, the predictive nature of the determination which prison officials are required to make in the instant case does not indicate the absence of a protected liberty interest even though these types of "predictive judgments" inherently involve a large measure of discretion. We conclude that the District Court erred in determining that the retention by prison officials of a large degree of discretion in making decisions regarding administrative segregation precluded the finding of a protected liberty interest. *See Winsett v. McGinnes,* 617 F.2d 996 (3d Cir. 1980) (en banc).

█ In accordance with the foregoing analysis we hold that the Guidelines in the instant case limited the discretion of prison officials in making decisions regarding administrative segregation and created a legitimate expectation on the part of inmates that they would not be transferred to administrative segregation absent a finding that such transfer was for the purpose of protecting that inmate or other inmates or for the purpose of promoting and maintaining order within the institution.[3]

## II.

The second question that must be answered is what process is due prison inmates before they are deprived of this protected liberty interest. *Walker v. Hughes, supra,* .558 F.2d at 1256. Plaintiffs argue that at the very least they are entitled to the three due process requirements set forth in *Wolff v. McDonnell, supra.*

In *Wolff* the Court held that there must be a hearing and that at least 24 hours in advance of the hearing the inmate must be given notice of the charges on which the action is based "in order to inform him of the charges and enable him to marshal the

facts and prepare a defense." *Wolff v. McDonnell, supra,* 418 U.S. at 564, 94 S.Ct. at 2979. The Court in *Wolff* also required that the factfinders must provide a written statement as to the evidence relied on and the reasons for disciplinary action in order to protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding and to help insure that prison personnel will act fairly. 418 U.S. at 564–65, 94 S.Ct. at 2978–79. *Wolff* also held that an inmate should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. *Wolff, supra,* 418 U.S. at 566, 94 S.Ct. at 2980.[4] *See also Baxter v. Palmigiano, supra,* 425 U.S. at 320–23, 96 S.Ct. at 1559–1560.

Appellees argue that these procedures were accorded the plaintiffs at the administrative segregation hearing in this case. The dispute on this issue arises from the parties' differing interpretations of the nature and extent of the notice and post–hearing explanation requirements in a case of administrative segregation. This case illustrates the difficulties in applying procedural due process requirements in cases where officials retain a great amount of discretion in making a "predictive judgment" and where the limits on that discretion are extremely broad guidelines rather than the finding of specific facts. Plaintiffs argue that they should have been given specific notice of the proposed reasons for placing them in administrative segregation. The notice given to each plaintiff indicated only that there was "sufficient cause to believe that his presence in the general population would constitute a threat to the welfare of other residents and to the good of the institution."

---

**3.** . For other cases regarding administrative segregation, *see Mitchell v. Hicks,* 614 F.2d 1016 (5th Cir. 1980), and cases cited therein; *Raffone v. Robinson,* 607 F.2d 1058 (2d Cir. 1979); *Four Certain Unnamed Inmates of Mass., Etc. v. Hall,* 550 F.2d 1291 (1st Cir. 1977); *Kelly v. Brewer,* 525 F.2d 394 (8th Cir. 1975); *Arsberry v. Sielaff,* 586 F.2d 37 (7th Cir. 1978); *Gary v. Creamer,* 465 F.2d 179 (3d Cir. 1972). *See*

*generally Winsett v. McGinnes, supra* (Delaware prisoner had protected liberty interest in work release once the specific criteria for work release eligibility had been met).

**4.** These due process requirements were also applied in *Wright v. Enomoto, supra,* and *Walker v. Hughes, supra.*

In order to properly analyze whether sufficient notice was given in this case it is necessary to review some of the critical differences between punitive and administrative segregation in Tennessee. Punitive segregation is imposed only for a serious infraction of specific prison rules, while administrative segregation *may* be based on the inmate's entire past record. Disciplinary reports alleging general behavior that requires administrative segregation may only be initiated by the Warden, rather than by prison employees generally. Guidelines, *supra*, Rules 4.601(5); 4.602. It is also clear, however, that administrative segregation is one of the options available to the Disciplinary Board in response to a finding that the inmate has committed a specific rule infraction. Guidelines, *supra*, Rule 4.601(5). In a case where the administrative segregation is based on a specific rule infraction, rather than general behavior, its purpose becomes almost identical with that of punitive segregation and there appears to be no reason why the procedural safeguards set forth in *Wolff v. McDonnell, supra*, and used in *Walker v. Hughes, supra*, should not apply to the specific rule infraction which triggered the decision.

A very different situation occurred in the instant case, however. The Warden issued the disciplinary report in this case because he had been notified on two occasions by informants that the plaintiffs were planning on taking a guard as hostage. Subsequently, when the Warden was informed that the plaintiffs had gathered in the gym, had requested to meet with him, and had responded with some profanity when the Warden sent a message that he would not meet with them at that time, Warden Lane surmised that the hostage taking was about to occur and ordered plaintiffs taken into "custody". Warden Lane also ordered a review of their records for a determination regarding administrative segregation. Consequently, the administrative segregation in this case was based on a "predictive judgment" by the Warden of the need to avoid an attempt at a hostage taking which would threaten the security of the institution. Warden Lane testified that when the plaintiffs' Resident Advisor requested a more specific version of the facts prior to trial, the Warden related his version of what had happened at the gym. Apparently, this information was never submitted to plaintiffs in written form and it is not clear whether the plaintiffs' Resident Advisor was even informed of the suspicion regarding hostage taking.

■■■■■ Even though administrative segregation was not used in this case in response to a specific rule infraction, if plaintiffs were to have a meaningful opportunity to marshal evidence in their behalf, they should have been given advance notice of the charges or occurrences which triggered the fear that their presence in general population posed a threat to the security of the institution. This conclusion is consistent with the analysis applied by this Court in deciding the procedural requirements in cases of this kind. *Walker v. Hughes, supra*, 558 F.2d at 1256–57. Such notice would promote a meaningful hearing and would help to protect inmates from arbitrary government action. The inmates' interests in this regard are not outweighed by the prison's interest in failing to disclose the reasons which triggered a decision regarding administrative segregation. Consequently, we hold that under the present prison Guidelines, inmates who are charged with being a threat to the security of the institution are entitled to notice regarding the facts which triggered those charges. Such notice should be specific enough to enable inmates to marshal evidence in their behalf, but need not disclose the identity of informants, as indicated in the Guidelines. Guidelines, *supra*, Rule 4.601(5). While this notice must specify the triggering event, it need not review all of the items in the inmate's prior record which the Disciplinary Board might properly consider in placing the inmate in administrative segregation. The notice given to the plaintiffs in this case did not meet these requirements.

Plaintiffs also argue that they were denied the due process protections guaranteed by *Wolff, supra*, when the Disciplinary Board failed to give them a written post–hearing statement containing the reason for the Board's decision and the evidence relied

on in reaching that conclusion. Defendants admit that the plaintiffs were not given a copy of the Board's recommendations and the reasons behind them, but argue that this post–hearing statement need not .be given to inmates because the purpose of it is to protect an inmate at a subsequent proceeding from a misunderstanding of the nature of the original proceeding.

 Again it is necessary to distinguish cases in which administrative segregation is used as a response to a specific serious rule infraction and cases in which administrative segregation is based on a general determination that the inmate is a threat in general population. In cases where administrative segregation is in response to charges and a finding of a specific, serious rule infraction, written statements of the evidence relied on and the reasons for the action must be provided as required in *Wolff v. McDonnell, supra*. However, where administrative segregation results from a determination, based on the inmate's entire record, that he is a threat to the security of the institution, then the determination is essentially a predictive one such as was present in *Greenholtz v. Nebraska Penal Inmates, supra*, 442 U.S. at 14–16, 99 S.Ct. at 2107–08. Consequently, it is not necessary to provide the inmate with a summary of the evidence relied on such as in a case where a determination of guilt is being made.[5] It is sufficient that the Disciplinary Board give the inmate a general statement of the reasons behind the transfer, including a statement regarding the "triggering event", if one exists. As in *Greenholtz, supra*, this statement of reasons can assist the inmate as a guide for future behavior. We reject defendants' contention that such a statement, although made by the Board, need not be given to the inmate.

As stated, in addition to serving the purposes outlined in *Wolff v. McDonnell, supra*, 418 U.S. at 565, 94 S.Ct. at 2979, the post–hearing statement will assist the inmate in modifying his behavior in the future so as to remain in general population. Further, the failure to give the post–hearing statement to the inmate would create needless difficulty in the enforcement of this requirement.

In summary, we hold that a transfer to administrative segregation entitles inmates to the procedures set forth in *Wolff v. McDonnell*, as reviewed above, where the transfer is in response to a determination of guilt of a specific infraction of the rules. However, when the transfer is based on a determination, considering the inmate's entire record, that the transfer will further the purpose of protecting inmates and maintaining order, then the inmate is entitled to notice which is specific enough to inform the inmate of the facts which triggered the charges and to enable the inmate to marshal evidence in his behalf. In such cases the post–hearing written statement must state the reasons for the decision, but need not state the evidence relied on.[6]

### III.

 Plaintiffs argue that they are entitled not only to the procedural protections outlined in *Wolff v. McDonnell, supra*, but also to the extensive procedural protections contained in Rule 4.601(4) of the Guidelines, including the right to call witnesses and the right to cross examine witnesses through the inmate's Resident Discipline Advisor, and the right to have the employee who executed the notice of rule infraction present to testify.[7] While the courts do not always view substantive guarantees granted by the state independently of the proce-

---

5. *Greenholtz v. Nebraska Penal Inmates, supra*, 442 U.S. at 15–16, 99 S.Ct. at 2108.

6. The transfer may precede the hearing in the case of a genuine emergency and as provided in Rule 4.601(a), (b), or (c) of the Guidelines. *See Enomoto v. Wright, supra*, 462 F.Supp. at 405.

7. Rule 4.601:
 4. The disciplinary board hearing procedures are:
 (a) That the resident who is accused of the rule infraction be brought into the hearing room first, where he is seated in the witness chair and informed of the nature of the charges brought against him and ask his plea as to the charges. (If he pleads guilty, the resident waives all his rights to witnesses, so forth). He is then confronted with the physical evidence, if any, or a sample thereof. The resident then moves out of the witness chair and on to the bench that is situated in the hearing room. The resident remains in the hearing room until all witnesses and evidence have been heard.

(b) That the employee who wrote up the resident then be called in to give his version of the rule infraction. Both the Discipline Committee and the Resident Advisor be given an opportunity to question the employee. The Discipline Committee questions first, then the Resident Discipline Advisor. The resident or resident advisor may waive the appearance by the reporting employee.

(c) That should the employee who executed the notice of rule infraction have a witness or witnesses, he then will be excused outside the hearing room. His witness or witnesses are then called in to give their version of the rule infraction. The Disciplinary Committee and the Resident Discipline Advisor will then be given an opportunity to question the witness or witnesses. The Discipline Committee questions first, then the Resident Discipline Advisor. Afterwards, the witness is excused outside the hearing room.

(d) Should the resident and/or his advisor have a witness to the alleged rule infraction, this witness shall be permitted to be questioned by the Resident Discipline Advisor without interruption and then be questioned by the members of the Discipline Committee without interruption. After completion of direct examination, cross examination or re-direct examination will be permitted.

(e) The resident accused of the rule infraction may take the witness chair to give his version of the rule infraction after all other witnesses have testified. The Resident Discipline Advisor and the Discipline Committee may question the resident. The Resident Discipline Advisor questions the resident first, then the Discipline Committee. The Resident Discipline Advisor will then be given the opportunity to give his summaration [sic] of the "Facts" presented in the rules infraction to the Discipline Committee. Afterwards, the resident and his Resident Advisor will leave the hearing room until such time as the Discipline Committee reaches a decision in this matter. The Chairman of the Committee must vote last. Committee room will be cleared of all people other than the Committee during the time of voting on guilt or innocence. If the board finds the resident innocent the Disciplinary Report is to be destroyed. If the board finds the resident guilty, the board may review his official institution record to assist in determining punishment; the resident shall be brought back to the Committee Room during the phase of the deliberations and confronted with the relevant portions of his institutional record. He may then make a statement about this record or the punishment which he thinks he should receive.

(f) The Board shall state in writing (a) evidence relied upon including the names of the witnesses; (b) the Board's findings of fact, which may or may not be the same as the reporting employees written complaints; (c) in cases involving indefinite administrative segregation or forfeiture of Good and Honor Time, the reasons supporting the sentencing decision must be given. Specifics must always be given. A mere finding of guilty is not sufficient.

(g) If the resident is found guilty of a major offense and should the board recommend the loss of good and honor time, it will not be submitted to the Commissioner for approval if the board is notified of the resident's wish to appeal. A resident must appeal within three days in writing to the Warden. If the appeal is denied, the board's recommendation will be sent to the Commissioner for approval.

Rule 4.601:

5. Disciplinary Reports alleging general behavior that requires Administrative Segregation may be initiated by the Warden or Deputy Warden, only. In these cases, the same procedures as described in 4.601(3) shall apply except that the resident's past record, as documented in his official file, may be considered by the disciplinary board prior to a decision on guilty or innocence. Confidential information given by inmates may be revealed to the Board without disclosure of the informant's identity. Such information shall be relayed to the committee by any employee having such information. But only if the Warden or Deputy Warden shall certify that disclosure of the informant's identity would jeopardize the safety and security of the informant or the institution. A short summary of such information shall be presented in writing to the Warden or Deputy Warden who shall initial or sign it and cause it to be attached to the initial report. In no case shall any testimony be given to the Board in the absence of the inmate charged. The Warden may countermand a finding of innocence by the Board and order Administrative Segregation for any period up to 10 days following which a new hearing must be held. This action should be taken only in emergency or unusual cases, and the Warden should give due weight to the findings of the Board. The Disciplinary Board has no power to pursue any course of action other than:

(a) Dismissal of charges (report destroyed)

(b) Verbal reprimand (report destroyed)

(c) Written warning

(d) Restriction of recreational privileges up to 60 days

(e) Punitive segregation up to 30 days

(f) Administrative Segregation (see 4.602)

(g) Reference to District Attorney for criminal prosecution (requires Warden's approval), see 4.603

(h) Recommendation to transfer to another institution

(i) Recommendation for reclassification

(j) Recommend loss of good and honor time

dural ones,[8] it is clear that as a general rule the determination regarding what process is due is made according to the balancing test used in *Wolff v. McDonnell, supra*, 418 U.S. at 556–63, 94 S.Ct. at 2974–78, and reviewed in *Walker v. Hughes, supra*, 558 F.2d at 1256–57, and not according to state procedural rules.[9] The appropriate determination regarding the process due plaintiffs before they could be deprived of their right to be free from transfer to administrative segregation except for reasons of safety and security was made by this Court in Section II of this opinion. Plaintiffs' assertion that state procedural rules are to be given significant weight in this determination is not supported by authority. While these procedural rules were first established pursuant to the decision in *Crafton v. Luttrell*, 378 F.Supp. 521 (M.D.Tenn.1974), rather than initiated by the state, all the rules may no longer be mandated in view of the decision in *Wolff v. McDonnell, supra*.

Plaintiffs also argue that they are entitled to the procedural protections contained in the Guidelines because those procedures create a protected liberty expectation. Other circuits which have addressed this question have ruled that protected liberty interests are not created by statutes or rules which establish only procedural requirements. *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979); *Lombardo v. Meachum*, 548 F.2d 13, 15–16 (1st Cir. 1977).

Plaintiff's argument is not without appeal, however, because the procedural requirements in question clearly satisfy the first prong of the procedural due process analysis in that they create a legitimate claim of entitlement in their use [10] and impose a limitation on the discretion of the Warden and the Disciplinary Board.[11]

 After careful consideration, however, we conclude that procedural rules created by state administrative bodies cannot, of themselves, serve as a basis for a separate protected liberty interest. The problem with allowing such a procedural rule to create a protected liberty entitlement is that the procedural due process analysis breaks down when the second prong of the analysis, the determination of what process is due, is applied. If the standard analysis is applied and interests are balanced as required in *Wolff v. McDonnell, supra*, then the process that is due in a given instance may bear little or no resemblance to the original expectation and so will do little or nothing to protect it. This case is an illustration of this point because the process that is due under the *Wolff* balancing test, as determined in Section II of this opinion, is far less than the procedural protections provided in the Guidelines themselves. The only alternative to the *Wolff* balancing determination would be to equate the process due with the original procedural expectations. If that approach were adopted, there would be a constitutional procedural due process right to have states adhere to any procedural rules pro-

---

(k) Refer to one or more treatment programs for intensive counseling

(*l*) Several possible combinations of the above

**8.** In *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), a plurality of the Court ruled that the grant of a protected interest which was qualified by limited procedural protections, entitled plaintiffs to no greater procedural protections than those which accompanied the grant of that interest. *But see Arnett v. Kennedy*, opinion of Powell, J., 416 U.S. at 166–67, 94 S.Ct. at 1650; opinion of White, J. at 177–78, 94 S.Ct. at 1655–56; dissent by Marshall, J. at 209–11, 94 S.Ct. at 1671.

**9.** *See generally Mathews v. Eldridge*, 424 U.S. 319, 332–35, 96 S.Ct. 893, 901–903, 47 L.Ed.2d

18 (1976); *Smith v. Organization of Foster Families*, 431 U.S. 816, 847–49, 97 S.Ct. 2094, 2111-12, 53 L.Ed.2d 14 (1977).

**10.** Rule 4.601 provides that departure from the disciplinary procedures may be authorized only by the Commissioner, Deputy Commissioner, or Assistant Commissioner for Adult Services.

With regard to the reasonableness of an expectation that a group will adhere to its own procedural rules, *see Yellin v. United States*, 374 U.S. 109, 123, 83 S.Ct. 1828, 1837, 10 L.Ed.2d 778 (1962).

**11.** Rule 4.601, n. 10. Warden Stonney Lane testified at trial that he was not free to deviate from the procedures contained in the Guidelines.

mulgated by them. While such adherence is certainly desirable, every deviation from state procedures cannot be viewed as a federal constitutional violation. Such a holding would make a large volume of state proceedings in the prison setting, in executive agency proceedings, and in judicial proceedings subject to complaint in the federal courts on due process grounds. We decline to so expand procedural due process.

While it is clear that procedural rules promulgated by departments or agencies within the federal government must be adhered to, *Yellin v. United States, supra,* 374 U.S. 109, 83 S.Ct. 1828 (1963); *Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1959), the history of the federal rule is based on federal law. *See United States v. Caceres,* 440 U.S. 741, 751–52, 99 S.Ct. 1465, 1471–72, 59 L.Ed.2d 733 (1979).[12] Consequently, these cases cannot be relied upon to support a constitutional claim. *But see Mabey v. Reagan,* 537 F.2d 1036, 1042 (9th Cir. 1976).

In accordance with the foregoing analysis, we affirm the determination of the District Court that the procedural rules issued by the Tennessee Department of Correction created no protected liberty interest.

### IV.

In parts I and II of this opinion, we ruled that the plaintiffs were not afforded their full due process rights prior to transfer to administrative or punitive segregation. Accordingly, we hold that under the present Guidelines promulgated by the Tennessee Department of Correction inmates have a right to the procedural protections outlined in Section II of this opinion prior to transfer to administrative or punitive segregation.

At oral argument, plaintiffs requested that their records be expunged. Expungement is not an appropriate remedy in this case for the reasons stated in *Wolff v. McDonnell, supra,* 418 U.S. at 573–74, 94 S.Ct. at 2982–83.

The District Court correctly ruled that restoration of good and honor time in a § 1983 action is foreclosed by *Preiser v. Rodriquez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Plaintiffs were properly denied recovery of damages under the rule stated in *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

Affirmed in part, reversed in part.

EDWARDS, Chief Judge, concurring specially.

I concur in and join the majority opinion as to all sections except Section III. I cannot agree with the rejection of plaintiffs' claims to procedural rights based on state prison regulations (see Guidelines, Rule 4.601(4)). I believe that these rules do establish a "legitimate claim of entitlement" and may not, as here, be arbitrarily disregarded. *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 2539 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2693, 2975 (1974).

---

**12.** Where the IRS was not required by the constitution to adopt regulations prohibiting "consensual electronic surveillance" between taxpayers and IRS agents without special prior authorization, the Supreme Court held "that the violations of agency regulations disclosed by the record do not raise any constitutional question." 440 U.S. at 751–52, 99 S.Ct. at 1471–72. It noted that Caceras could not reasonably contend that he relied upon the regulation or that its breach had any effect on his conduct. The same is true of the procedural rule here.