**R. SMALLWOOD–EL, et al., Plaintiff,**

**v.**

**Thomas A. COUGHLIN III, Individually and in his official capacity as Commissioner of New York State Department of Correctional Services; Stephen Dalsheim, Individually and in his official capacity as Superintendent of Downstate Correctional Facility; and Hyland Sperbeck, Individually and in his official capacity as Deputy Superintendent For Security of Downstate Correctional Facility, Defendants.**

No. 83 Civ. 2541(MP).

United States District Court, S.D. New York.

July 6, 1984.

---

R. Smallwood-El, pro se.

Robert Abrams, Atty. Gen., of the State of New York by Melvyn R. Leventhal, Howard Zwickel, Eugene Murphy, Asst. Attys. Gen., New York City, for defendants.

## OPINION

POLLACK, Senior District Judge.

Plaintiff R. Smallwood-El is a prisoner presently confined at New York State's Long Island Correctional Facility pursuant to a New York criminal conviction. He brought this *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, to recover damages for alleged violations of several constitutional rights which he claims resulted from his segregated confinement to a Special Housing Unit ("SHU") at the New York Downstate Correctional Facility in Fishkill, New York, from November 11, 1980 to March 23, 1981.

Plaintiff named as defendants Thomas A. Coughlin III, the Commissioner of the New York Department of Correctional Services, Stephen Dalsheim, the Superintendent of the Downstate Correctional Facility, and Hyland Sperbeck, a Deputy Superintendent at the Downstate Correctional Facility.

Defendants have moved for summary judgment pursuant to Rule 56, Fed.R. Civ.P. For the reasons which follow, the motion is granted.

FACTS

Uncontroverted facts set forth in the pleadings and papers filed in connection with the summary judgment motion establish the following:

On November 14, 1980, plaintiff was brought to the "draft processing area" of the Downstate Correctional Facility (hereinafter "Downstate") for admission to that facility. While waiting to undergo admissions procedures, plaintiff was involved in a disturbance during which, according to reports on the incident, plaintiff refused to obey a guard's order to go to an identification room, used boisterous and obscene language, became violent, and swung a closed fist at a guard.

As a result, and upon the approval of a corrections lieutenant, plaintiff was immediately confined on a 24-hour-per-day basis to the prison's SHU. According to state regulations, a SHU is:

A cell, group of cells or housing space within a facility, maintained separate and apart from cells or housing space used by inmates in the general population, for confinement of inmates who are not in a program that permits them to commingle with each other.

7 N.Y.Codes, Rules and Regulations § 300.-2(b).

Plaintiff received on November 14, 1980 a Notice of Misbehavior Report regarding the disturbance. On November 17, a proceeding relating to the Misbehavior Report was held before the prison's Adjustment Committee, during which a disciplinary hearing, known as a Superintendent's Proceeding, was scheduled and it was determined that plaintiff's confinement in the SHU would continue.

On November 20, a written formal charge was issued to plaintiff concerning the November 14 disturbance. This charged plaintiff with attempted assault, creating a disturbance, disobeying a direct order, making threats, and using abusive and obscene language. The charge stated that a Superintendent's Proceeding would be held the next day and explained that plaintiff could make any statement he wished at the hearing, that he could remain silent, and that he could call witnesses on his own behalf.

On November 21, a tape-recorded Superintendent's Proceeding was conducted before defendant Sperbeck. Plaintiff was present but declined to enter any plea to the charges. Plaintiff protested that his confinement in the SHU and the procedures being accorded to him were unlawful. Sperbeck made no disposition of the charges at this time, and plaintiff was returned to the SHU for segregated confinement on a 23-hour-per-day basis.

At the same time that these disciplinary proceedings were taking place, but apparently unrelated thereto, prison medical officials asked plaintiff to provide information concerning his medical history. A medical history form dated November 17, 1980 indicates that plaintiff stated he had had gonorrhea in 1972. Pursuant to the instruction of a doctor at the prison, medical personnel sought to obtain a blood specimen from plaintiff in order to determine if he was then suffering from venereal disease.

Plaintiff refused to have his blood drawn for religious reasons. As stated in the complaint, "[p]laintiff sincerely believes it would have been sinful to allow doctors to perform an unwarranted operation on his person, however minor, as a Muslem under the Divine Laws of the Holy Koran of Mecca."

A "refusal form" dated November 19, 1980 indicates that prison medical personnel, confronted with plaintiff's refusal to undergo a blood test, explained to him he would be kept in isolation until "cleared by Public Health to go to population." A memorandum dated November 20, 1980 and signed by Ruth Kellogg, Nurse Administrator, stated:

Refused bloodwork for public health screening. Until a VDRL is obtained, this man must remain isolated (in quarantine). Not allowed out of cell.

The status of plaintiff's 23-hour-per-day confinement in the SHU remained unchanged until January 19, 1981. Prior to that date, no further disposition was made regarding the incident or misconduct, nor did plaintiff consent to a blood test.[1]

On January 19, 1981, a sixty-six days after he was first confined to the SHU, plaintiff was brought before defendant Sperbeck. At this time, Sperbeck issued a Superintendent's Proceeding Report which found that plaintiff was to be confined to

---

**1.** Prison records chronicling plaintiff's confinement in the SHU indicate that during this period plaintiff was given at least two further opportunities to have his blood tested. A November 24 entry states "Sgt. Jiminez to interview inmate on why he refused VDRL blood work." An entry dated January 8 states "escorted to facility hospital for blood work."

the SHU for 66 days as discipline for the misbehavior incident. The report recognized that plaintiff had already served this time, but concluded that plaintiff, having "refused to cooperate with medical department in having a physical", should be "continued in S.H.U. until released by the medical department."

An internal memorandum from Sperbeck to Superintendent Dalsheim explained Sperbeck's actions concerning plaintiff's continued SHU confinement:

> I feel that we have exhausted every administrative effort to convince this man that he should have a physical. He has been seen by the medical staff, psychologists, ministerial staff and counseling staff.

> Yesterday (January 19, 1981), I had an informal interview with this inmate. He still is going into his "Its against my religion and I am not submitting to having blood taken" attitude.

> Rather than to go through a legal procedure (court order), it is my recommendation that this inmate remain in the Special Housing Unit until he either voluntarily submits or Central Office Medical Staff feel the need to take a different type of action.

Medical records before the Court indicate that a member of the prison's medical staff saw plaintiff in the SHU on January 21, 1981, at which time plaintiff again refused to have blood drawn or to consent to a physical exam "to check for physical evidence of any communicable or venereal diseases." A notation below this entry states "he will remain in SHU until consent is given."

It appears that plaintiff remained confined in the Downstate SHU until March 23, 1981, when he was transferred to the Attica Correctional Facility. He remained in isolation at Attica for approximately five days, during which he was seen by a doctor, and was thereafter released to the general prison population at Attica.[2]

MERITS OF THE DISPUTE

A. *Due Process Issues*

A major thrust of plaintiff's damage action is that his right to due process, guaranteed to him under the Fourteenth Amendment, was violated because the defendants allegedly failed to follow proper procedures in confining him to the SHU. An analysis of this branch of plaintiff's claim reveals that notwithstanding *possible* noncompliance by the defendants with procedural requirements imposed by *state* law, plaintiff has neither alleged nor substantiated facts to show that defendants violated his *federal* constitutional rights under the Due Process Clause.

(1) *Was there a liberty interest?*

A threshold inquiry is whether plaintiff had a liberty interest, protected by the Fourteenth Amendment, in being confined among the general prison population rather than to the segregated quarters of the SHU. In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court decided that the Due Process Clause does not of its own accord give rise to such a liberty interest in the case of a state prisoner confined to "administrative segregation"—a form of solitary confinement similar to that in the SHU—during the time that disciplinary charges are pending and under investigation.

---

**2.** Plaintiff raises in his brief, although not in his complaint, issues of alleged violations of constitutional rights which allegedly occurred at New York correctional facilities other than Downstate. In particular, plaintiff's brief states that while he was at Attica he was subjected to an eleven-month, twenty-three-hour-per-day segregated disciplinary confinement, allegedly without being accorded proper procedural safeguards.

Because plaintiff's complaint challenges only the conduct of prison officials during his con-

finement at the Downstate SHU, and also because plaintiff currently has an action pending in the federal court for the Western District of New York which challenges aspects of his Attica confinement, *Moorish Science Temple of America, Inc., Bro. R. Smallwood-El v. Smith,* 81–0911C, *appealed and remanded,* 693 F.2d 987 (2d Cir.1982), this Court construes this action as challenging only the legality of plaintiff's SHU confinement at Downstate.

*Hewitt* held, however, that Pennsylvania law governing administrative segregations did accord to state prisoners a federally protected liberty interest in remaining in the general population rather than in segregated confinement. The Court stated:

> the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates [to administrative segregation] demands a conclusion that the State has created a protected liberty interest.

*Hewitt*, 103 S.Ct. at 871.

Thus, a determination of whether federal law guaranteed plaintiff any procedural protections with respect to his SHU confinement requires an examination of New York law.

Upon a review of New York's prison regulations governing SHU confinements, the Court concludes that New York, like Pennsylvania, has accorded prisoners a federally protected liberty interest in remaining in the general population and thus has placed SHU confinements under the purview of the Due Process Clause. In so concluding, the Court relies particularly upon regulatory provisions which state that SHU confinements are permissible "only as necessary" to carry out certain carefully specified purposes. 7 N.Y.Codes, Rules and Regulations § 300.3(c).

With respect to SHU confinements such as plaintiff's, the regulations require, as a substantive predicate, that the confinement serve one or more of the following purposes:

> protecting potential victims, insuring witnesses against intimidation, maintaining inmates who lack the strength to live in the general institutional community, controlling inmates whose violent emotions are out of control or who refuse to behave in an orderly fashion or for main-

taining inmates who must be restricted from communication with the general population.

*Id.* § 300.3(b)(3).[3]

■ On the foregoing basis, the Court determines that federal law required prison authorities to adhere to the requirements of the Due Process Clause in confining plaintiff to the SHU.

#### (2) *What process was due?*

Having determined that the Due Process Clause is applicable, the Court must next determine whether plaintiff was accorded all procedures due to him under that clause. *Hewitt* made clear that Due Process in the context of administrative segregations does not entail the full panoply of procedural safeguards mandated in connection with most other deprivations of liberty by state authorities.

According to *Hewitt*, when a prisoner is placed in "administrative segregation"—a term which clearly encompasses plaintiff's SHU confinement during both the phase in which it was based on grounds of misbehavior and the pendency of a disciplinary proceeding and the phase in which it was premised on medical grounds—the Due Process Clause mandates that "an informal, nonadversary evidentiary review" be conducted "within a reasonable time" after the segregation commences. 103 S.Ct. at 874 & n. 8. The Supreme Court detailed the parameters of this review process as follows:

> We think an informal, nonadversary evidentiary review sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him.

---

**3.** *See also* § 304.2(b) (protective and detention admissions to SHUs permissible "only in accordance with sections 304.3 and 304.4", and only where authorized in writing by a supervisory officer); § 304.3(c) (requiring formal evidentiary hearing "to determine if there is substantial evidence that protective custody is necessary"); § 304.4 (detention admissions to SHU permissible "in cases of misbehavior in the facility" or "in cases where an inmate is received from another correctional facility and his record in the other facility raises a reasonable question as to whether he presently is ready to adhere to the department's rules and policies governing inmate behavior").

An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 874.

■ In light of *Hewitt*, the uncontroverted facts propounded by the parties establish that plaintiff received all the process guaranteed by federal law.

With respect to the phase of his confinement relating to allegations of misbehavior, plaintiff personally appeared before the Adjustment Committee three days after the incident, plaintiff received written notice of the charges against him six days after the incident, and a Superintendent's Proceeding was held seven days after the incident, at which plaintiff was afforded an opportunity to present orally his version of the facts and to call witnesses on his own behalf.

■ While the Court views defendant Sperbeck's unexplained failure to render a decision on the misconduct charges until nearly 60 days after the holding of the Superintendent's Proceeding as a troublesome fact raising a close question under the Due Process Clause,[4] in the unique circumstance of this case—in which medical staff had directed that plaintiff be isolated within a few days of the commencement of his SHU confinement due to misbehavior—the Court finds that this delay did

not contravene federal law. Thus, the SHU confinement for reasons connected with allegations of misbehavior did not infringe plaintiff's right to due process.

Plaintiff has similarly failed to allege or substantiate facts to indicate that the second phase of his SHU confinement, which lasted sixty-one days and was premised solely on the decision of prison medical personnel that plaintiff should be isolated, violated his rights under the Due Process Clause.

■ Uncontroverted facts in the record establish that plaintiff was given oral notice on November 19, 1980, that his refusal to submit to a blood test would cause him to be isolated from the general population. On January 19, 1981, an informal meeting was held between plaintiff and defendant Sperbeck during which plaintiff was afforded an opportunity to explain why he felt he should not be quarantined. In light of *Hewitt,* and in view of the fact that medical professionals on the prison's staff had themselves concluded that isolation was warranted, the Court concludes that the informal procedures accorded to plaintiff in connection with his SHU confinement for medical reasons comported with the requirements of the Due Process Clause.

### (3) *Impact of State procedural rules.*

Plaintiff further alleges that the defendants failed to comply with state procedural rules governing SHU confinements, and urges that such noncompliance in and of itself violated his federal right to Due Process. Plaintiff has alleged facts which, if true, indicate that certain New York correctional services regulations were not adhered to with respect to plaintiff's SHU confinement.

---

**4.** As stated in *Hewitt,*
> Of Course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates.

*Id.* 103 S.Ct. at 874 n. 9. In this regard, the Court notes that plaintiff in *Hewitt* was held in administrative segregation for over seven weeks prior to receiving either an evidentiary hearing or a decision in his case. However, unlike the instant case, the delays in reaching a conclusion in *Hewitt* were attributable to the authorities' ongoing investigation into the alleged misconduct.

For example, facts set forth in the record appear to indicate that state authorities failed to adhere to a state regulation which mandated the prompt holding of a formal evidentiary hearing to determine whether there was substantial evidence that plaintiff's confinement for medical reasons was necessary. 7 N.Y.Codes, Rules and Regulations § 304.3(c).[5]

■ Violations of state procedural rules, however, do not of their own accord deprive an individual of a federally protected liberty interest, and therefore do not give rise to an actionable claim under 42 U.S.C. § 1983. As set forth in *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir.1979),

[a]lthough a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural requirements.

*See also Olim v. Wakinekona*, 461 U.S. 238, —— & n. 12, 103 S.Ct. 1741, 1748 & n. 12, 75 L.Ed.2d 813 (1983) ("an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause"); *BAM Historic District Association v. Koch*, 723 F.2d 233, 236–37 (2d Cir.1983); *Bills v. Henderson*, 631 F.2d 1287, 1298–99 (6th Cir.1980); *Almanza v. Oliver*, 368 F.Supp. 981, 985 (E.D.Va.1973) ("Absent a showing of invidious discrimination, penal authorities' failure to comply with their own regulations constitutes, at most, a violation of state law, but does not state a constitutional claim.").

■ Therefore, plaintiff's allegations that New York procedural rules were not followed in connection with his SHU confinement do not implicate federal law. Whether state regulations were in fact contravened, and whether plaintiff has a right

under the prison regulations which may be enforced in state court, are matters not resolved by this litigation. In light of the Court's disposition of plaintiff's federal claims, the Court declines to exercise pendent jurisdiction over such state law claims as may be raised by the complaint herein. *See BAM Historic District*, 723 F.2d at 237.

### B. *Religious Freedom Claims*

Plaintiff additionally seeks to recover damages from defendants on the ground that his right to freedom of religion under the First Amendment was impermissibly burdened when he was confined to the SHU after refusing on religious ground to undergo medical tests.

The Court concludes on the basis of uncontroverted facts set forth in the record that plaintiff's religious belief in not subjecting himself to certain medical procedures, which the Court assumes is a sincerely held tenet of his faith, was not, in light of the institutional interests at stake, unconstitutionally burdened by plaintiff's SHU confinement.

The accommodation of the religious beliefs and practices of prisoners with the legitimate goals of prison administration has been a common source of litigation. In *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975), the Second Circuit set forth the following standard:

Where [institutional prison restrictions] operate on fundamental rights such as the freedom of worship, the degree of restriction must be only that which can be justified by an 'important or substantial government interest' in the restriction by the penal institution.

*Id.* at 495 (quoting *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

---

**5.** The Court also notes that New York regulations currently in effect mandate the completion of a Superintendent's Proceeding within 14 days of the filing of a Misbehavior Report and a written disposition of disciplinary charges within 24-hours of the completion of such proceeding. In the instant case, uncontroverted facts in the record establish that no written disposition of the disciplinary charges was made until approximately 60 days after the hearing before defendant Sperbeck. The Court has not been informed whether this scenario contravened New York regulations in effect at the time of plaintiff's SHU confinement.

■ Correctional facilities obviously have an important and substantial interest in ensuring that prisoners not be admitted to the prison general population if they are carrying contagious diseases. *See, e.g., Jones v. Diamond,* 636 F.2d 1364, 1374 (5th Cir.1981) (exposure of prison population to persons who are contagiously ill contravenes federal guarantees against cruel and unusual punishment). The Court perceives no less restrictive means by which this purpose can effectively be served than by administering such routine and relatively unintrusive medical tests as those recommended for plaintiff by medical professionals at Downstate.

■ Given these considerations, the Court holds that plaintiff has neither alleged nor substantiated facts which show that the decision to confine him to the SHU for medical reasons violated his right to freedom of religion.

Plaintiff also asserts that his First Amendment right to freedom of worship was denied as a result of the conditions of his SHU confinement, on the ground that his inability "to freely associate with others [ ] deprived him of his ability to carry on his Divine Calling and pursuit of happiness." He further asserts that this First Amendment right was abridged by prison authorities' refusals to permit him to attend religious services or to receive visits from a clergyman of his faith.[6]

■ While the Court recognizes that even prisoners in segregated confinement retain substantial rights to exercise their religion, it concludes, in light of the prison medical staff's directive that plaintiff be quarantined, that plaintiff has neither alleged nor substantiated facts which indicate that the restrictions on plaintiff's religious practices resulting from his SHU confinement violated his First Amendment rights. *See LaReau v. MacDougall,* 473 F.2d 974, 979 (2d Cir.1972), *cert. denied* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

### C. *Other Constitutional Claims*

In addition to the foregoing, plaintiff's complaint asserts that his confinement to the SHU contravened multifarious other constitutional rights, including those secured by the Equal Protection Clause, the Contract Clause, the Sixth Amendment's right to legal counsel, and the Eighth Amendment's prohibition against cruel and unusual punishment. The complaint further seeks to vindicate alleged violations of constitutional rights of other prisoners at Downstate whom plaintiff claims were denied improperly plaintiff's religious and legal services and assistance.

A careful review of these additional and wide-ranging claims, as well as an examination of all factual support offered therefor, leads the Court to conclude that there is no genuine issue as to any material fact, and defendants are entitled to judgment as a matter of law, with respect to these claims.

### CONCLUSION

An examination of all of the pleadings and other papers on file with the Court in this action reveal that plaintiff has neither alleged nor submitted facts which indicate that his rights under federal law were contravened by his confinement to the Downstate SHU. In light of this conclusion, it is unnecessary for the Court to examine the factual and legal issues presented by the defendants' argument that in any event they are shielded from liability for damages under the qualified immunity defense articulated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The pleadings and other papers before the Court show that there is no genuine issue as to any material fact with respect to any and all of plaintiff's claims in this action, and that the defendants are entitled to a judgment as a matter of law. Summary judgment on all claims is accordingly granted to the defendant.

SO ORDERED.

---

**6.** The record establishes that a Muslim Chaplain visited plaintiff during his SHU confinement. Plaintiff states that this chaplin was not a minister of his faith. Plaintiff has neither alleged nor substantiated that a clergyman of his faith would have been available to him had he been in the general prison population rather than in the SHU.