**Robert PARKER, Plaintiff,**

**v.**

**A. F. COOK, Individually, Edward Sands, Individually, and Lt. Glen Gilbert, Individually, Defendants.**

**No. 76–8062–CIV–CF.**

United States District Court, S. D. Florida.

Feb. 1, 1979.

---

4.  *United Steelworkers of America v. Enterprise Wheel and Car Corp., supra.*

Bruce Zeidel, West Palm Beach, Fla., for plaintiff.

Robert L. Shevin, Atty. Gen., of the State of Florida, and Thomas A. Beenck, and Joseph W. Lawrence, Asst. Attys. Gen., Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION

FULTON, Senior District Judge.

This cause came before the Court for trial. The Plaintiff, Robert Parker, represented by private counsel, brings this action under the Civil Rights Acts for damages. The Court has jurisdiction over the parties to and the subject matter of this cause under Section 1343 of Title 28, *United States Code*, and Section 1983 of Title 42, *United States Code*.

Plaintiff, Robert Parker, was at the time of the acts complained of an inmate at Glades Correctional Institution (G.C.I.); at time of trial he was confined at the Florida

State Prison at Raiford. The defendants are the Superintendent of G.C.I., A. F. Cook; a lieutenant at G.C.I., Glen Gilbert; and a Florida Prison Inspector, H. Edward Sands. Each defendant is alleged to have participated directly in the acts alleged in the complaint.

Parker, in his complaint, alleges that on October 27, 1975, the defendants accused him of conducting a confidence game in the prison, and placed him in a detention cell where he was held without communication, subjected to inhumane conditions and denied medical attention. Parker further alleges that he was kept confined for a period of forty-six days, until his physical condition required hospitalization.

## THE PLACEMENT PROCESS

On October 30, 1975, the defendant Sands commenced an investigation of the plaintiff, acting on information given by an inmate at Glades Correctional, William Morgan, that the plaintiff and another inmate, S. K. Bronstein, were selling favors to other inmates.

Sands, after arriving at the Glades facility, interviewed the inmate Morgan, discussing with him his allegations against the plaintiff. Sands, satisfied that further investigation was necessary, called the plaintiff in for an interview. The plaintiff was taken from the general prison population during the evening hours of October 30, 1975. He was brought to the interviewing area of the special confinement wing of the prison where he met with the defendant Sands.

In this interview plaintiff was confronted with the allegation that had been made against him. Plaintiff was informed that while the investigation was proceeding that he would be placed in "administrative segregation." Sands at this time informed the defendant Gilbert that plaintiff was not to have access to the telephone while in "administrative segregation." Further, Gilbert was directed to review plaintiff's mail to determine whether there was contact with the outside in regard to the alleged confidence operation.

## THE PHYSICAL CONDITION OF THE SEGREGATION WING

The confinement cells used at G.C.I. are located in a separate wing of the prison. There are about 15 cells in the wing. These cells are used for both "administrative" and "punitive" segregation.

The cells are all similar, each measures five feet by eight feet. The cells have metal doors with heavy grating over the openings therein. Each cell has an entrance for the supply and removal of food trays. The cells are equipped with commodes, a sink with only cold water, two mattresses, two mattress covers, and four blankets. There are bunk facilities on which to place mattresses in some of the cells, in others one of the mattresses must be put on the floor.

Lighting and climate control in the cells at the time complained of were non-existent. There were no lights in the cells. Lighting was supplied by fixtures located in the corridor outside of the cell doors. Only natural light was provided during the daytime hours.

Ventilation was by "natural air flow." No circulation or exhaust fans were used. There was no automatic cooling or heating system. In fact, there was no heating system whatsoever in the building. During plaintiff's segregation the temperature in his cell often reached into the 40° range and was in the 30° range on at least one occasion. The method of controlling the temperature in segregation was simply to hand out an additional blanket.

The day to day cleanliness of the cells was poor. The State blamed this condition on the neglect of the persons occupying the wing. It appears that there were cleaning utensils (brooms, mops and soaps) available, but that the inmates failed to make use of them to clean their own cells. Although the testimony was in conflict as to the condition of the shower area, the Court finds that area to be minimally adequate.

Each inmate received three meals a day while in the segregation wing. A medical

technician consulted with each inmate daily. The entire medical record of the plaintiff was placed into the record, and it reveals that plaintiff received minimal medical attention during the period of his special confinement until his removal to the hospital with a severe cold. When discharged from the civilian hospital, he was returned to the general prison population.

In making the foregoing findings, the Court has not overlooked the testimony of the witness Manke, an investigator for Palm Beach County Public Defender's Office, who described the condition of the cellblock in question as filthy, infected with vermin, without soap or towels, and otherwise abominable. Having intently observed that witness as he testified for the purpose of making credibility findings, the Court is of the opinion that his testimony was exaggerated and not worthy of belief. For the purpose of confirming this finding, the undersigned made an unannounced visit to the institution and inspected the cellblock in question at a time when it was fully populated and found none of the conditions that the witness Manke described.

## THE PERIOD OF SEGREGATION

### The activities of the defendant.

After the plaintiff was placed into the "administrative" segregation category and confined in the segregation wing, the defendant Sands continued his investigation of the charges until he was relieved by H. R. Ackett sometime in November. The investigation involved a widespread con game operation within the institution that involved both inmates and civilian employees. The evidence showed that the plaintiff and his inmate associate Bronstein, aided and abetted by civilian workers, collected substantial sums of money from other inmates and their relatives and friends in exchange for promised favors such as work releases, better bunk assignments, promises of early parole, and transfers to other institutions. There was evidence that single payments involved as much as $5,000. The investigation necessarily moved slowly. It was an ongoing investigation at the time that Sands was relieved by Ackett.

During the period of the confinement which had been ordered by Sands, the defendant Cook was aware of Parker's continued presence in segregation by way of the reports. Cook had been away from the institution at the time of Sands' actions and had never been briefed nor provided any memorandum by Sands as to the reasons for Parker's segregation. Either Cook or his assistant, Moody, approved the DC2 form which authorized the segregation placement. Basically, Cook relied on Sands' judgment for placement.

While Cook apparently was uninformed as to the reasons for Parker's placement, there can be no doubt that he was aware of the conditions in the cellblock.

The defendant Gilbert was assigned to the segregation unit, and was responsible for its functioning. Gilbert stated that he was in the segregation unit daily and saw the plaintiff each day. Gilbert also had the responsibility for examining plaintiff's incoming and outgoing mail and for enforcing the orders of the defendant Sands.

The cellblock provided for administrative and punitive confinement was old and in need of repair and modernization; but it was all that the State of Florida provided to Cook as Superintendent of the Institution. Considering its age and also the prison population at the institution, the Court finds that the facility was utilized and operated by those in authority at the prison, including Superintendent Cook, as efficiently as the conditions mentioned would permit. Sands did no more than conduct an investigation which he was authorized and obligated to do and which was ongoing at the time he was relieved. Gilbert was simply a civilian employee at the institution who performed those functions which he was ordered to perform by his superiors. Cook, Sands and Gilbert all acted within the scope of the authority delegated and entrusted to them in their various capacities at the institution. None of them performed his assigned duties toward the plaintiff or other inmates with malice.

*The activities of Parker.*

During the period of "administrative" segregation, plaintiff remained within the confines of the segregation unit. Plaintiff was subjected to stay in the unit for the period of the investigation.

Plaintiff was placed in the unit on October 30, 1975 and remained there until December 11, 1975 when he was moved to the prison hospital because of a cold and for treatment of sores. Plaintiff was in segregation for a period of 42 days.

The routine during plaintiff's segregated confinement was limited to detention within the cell, twice weekly showers, and infrequent exercise periods. Plaintiff received three meals a day, which apparently were similar to those served to the general prison population, although cold because they had to be transported to the unit.

While in segregation the plaintiff was either in isolation or placed with one other inmate. The cell assignments were based on the population in segregation, the doubling up occurring when the population exceeded fifteen. Inmates that were in "administrative" segregation were mixed with inmates in "punitive" segregation.

## ADMINISTRATIVE SEGREGATION DEFINED

The segregation unit of G.C.I. is created for the purpose of housing prisoners for purposes of discipline. This form of segregation is known as "punitive" segregation. A secondary purpose of the unit is for housing prisoners placed in a status known as "administrative" segregation. Administrative segregation is defined in the Florida Department of Corrections Inmate Treatment Directive 5.04(B) as:

Confinement, other than disciplinary confinement, which results in a loss of some privileges which the inmate would have if assigned to general population in the institution. Such confinement is effected pending disciplinary action or for reasons other than disciplinary.

Section 5.12 of the Directive sets out the procedures for placement in administrative segregation, and the reasons for such status. Section 5.13 of the Directive describes the standards for the confinement facilities.

Attached to the Directive is a catalog of offenses and maximum times for detention in disciplinary confinement. Noticeably absent from the Directive is any procedure for release from "administrative" confinement.

The Directive discloses no differences between "punitive" or "administrative" segregation. However, prisoners in administrative segregation are permitted limited smoking and additional shower privileges. Beyond that the conditions are the same.

## THE ISSUES

The complaint herein raises four basic issues. These are:

(1) Whether the plaintiff was denied access to counsel;

(2) Whether the plaintiff was denied adequate medical attention;

(3) Whether the plaintiff was subjected to conditions which were cruel and unusual so as to violate the Eighth Amendment; and

(4) Whether the plaintiff was denied due process.

*Denial of Access to Counsel.*

Mail privileges of prisoners may be limited only in the interest of security. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); and *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir. 1975). The facts of this case disclose that plaintiff did lose his right to use the telephone, but that his mail privilege was not removed. During the period in question, plaintiff had a lawyer-client relationship with an attorney whom plaintiff identified as William Lakeland, Esq. The plaintiff acknowledged that this attorney was at the institution at least three times, although the dates were not specified. The plaintiff also testified that he was seen by another attorney by the name of Starter. There was a directive issued by Inspector Sands to Lt. Gilbert to examine plaintiff's mail carefully, but plaintiff neither sent nor received mail dur-

ing that period, at least through channels. For these reasons, plaintiff was not denied his right to communicate with counsel.

### Denial of adequate medical attention as a violation of the Eighth Amendment.

■ The Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) held that the elementary principles of the Eighth Amendment establish the government's obligation to provide medical care for those whom it is punishing by incarceration. However, the Court limited the application of this rule by concluding that the denial of medical treatment violates the Eighth Amendment only when deliberate indifference to the serious medical needs of the prisoners is shown.

The facts of this case indicate that plaintiff was seen daily by a medical technician and that he had few complaints about his physical condition during his segregation. The record further reveals that the plaintiff was taken from segregation to the prison hospital when he contracted a cold.

The cause of this transfer is unknown and may have resulted from plaintiff's filing of a petition for a Writ of Habeas Corpus in the State Court. It suffices at this point to say that regardless of the reason for the transfer plaintiff was not subjected to medical conditions which violate the Eighth Amendment.

### Whether conditions of segregation constituted Cruel and Unusual Punishment.

■ The conditions of segregation which are complained of are categorized as "administrative." The fact that such activity is classified "administrative" does not remove it from Eighth Amendment consideration. *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958). Recently, the Supreme Court in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), observed that "confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."

The Supreme Court in *Hutto* recognized that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." The Court stated that conditions of confinement cannot be judged in a vacuum but must be examined in light of the circumstances, one of which is the length of the period of segregation. The Court there was considering an indefinite confinement period, a period which the Court found capable of regulation and potentially violative of the Eighth Amendment.

The Court is confronted with the problem of whether there is any real distinction between administrative and punitive segregation. The State contends that the mere classification is distinction enough. However, examination of the facts reveals no more than a paper distinction, a distinction without a difference.

The Supreme Court in *Trop v. Dulles*, 356 U.S. 86, 95, 78 S.Ct. 590, 595, 2 L.Ed.2d 596 (1958), stated that "even a clear legislative classification of a statute as 'non-penal' would not alter the fundamental nature of a plainly penal statute."

Aside from the minor, if not negligible, distinctions of being permitted to take two showers a week instead of one, and being allowed certain smoking privileges, the conditions of confinement are identical. Moreover, the persons placed in punitive segregation know their date of release while the persons placed in "administrative" confinement for an indefinite period such as "for investigation" do not know the date of their release.

The Court concludes that there is no difference between the artificial administrative and punitive segregation distinction at G.C.I. The Court further finds that the administrative segregation at G.C.I. is penal in nature and therefore is within the purview of the Eighth Amendment.

■ The general physical conditions in the segregation unit at G.C.I. during plaintiff's confinement were at best poor. Added to these conditions the Court must consider the atmospheric temperature which often dipped into the 40° range and occasionally into the 30's. An extra blanket

under those conditions is hardly adequate. Finally, the Court must consider the mental state of a person exposed to these conditions who is uncertain as to the length of time he is to be exposed to them.

Examining this set of facts and circumstances, the Court finds that the placement of plaintiff in administrative segregation, subjected to the conditions found therein, when added to the confinement for an undetermined period of time, constitutes a violation of the Eighth Amendment cruel and unusual punishments clause within the rule of *Hutto,* supra.

Plaintiff seeks damages against the Superintendent, the investigator, and the confining officer at the institution. However, these defendants did not provide the cellblock nor are they responsible for its maintenance. They simply were in charge of its operation within the scope of their authorized duties and responsibilities. Moreover, State officials such as these possess a qualified immunity from damages, *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978).

The test to be applied under the rule of *Procunier* is whether the official " 'knew or should have known that the action he took within his sphere of official responsibility would violate the rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person].' "

■ There is no proof in this case that these defendants or any of them knew or should have known that the action they took would violate the plaintiff's constitutional rights, nor has it been shown that they or any of them acted with malicious intention to injure the plaintiff or to deprive him of constitutional rights. Accordingly, the prayer for money damages against each of the defendants is denied.

*Due Process Issue.*

■ In reviewing the directives and case law, there is no doubt that due process is required. A review of Regulation 5.12(A)(1) of the Inmate Treatment Directives discloses in subsection (a) a requirement that the inmate be informed of the reason for his placement in Administrative Confinement; and, that said inmate be permitted to make a statement, which is to be recorded. Subsection (b) of regulation 5.12(A)(1) requires a review by the Classification Team, approval by the Superintendent and inclusion of the record in the inmate's file. Subsection (c) requires periodic review of the inmates incarcerated in "Administrative Segregation."

This system in and of itself provides minimal due process, however, it does not require all of the elements of *Wolff.* Therefore, the issue is whether *Wolff* is applicable herein. In determining whether the same standard of due process is required in administrative segregation cases as that in punitive segregation cases the Court must look to the differences in fact, as discussed more fully above. The inmates in punitive and administrative are housed in the same facility. In fact, inmates in both categories are often housed together. The State points out that there are basic differences in the treatment of persons in the two categories. It is stated that persons in administrative segregation are permitted tobacco and additional shower privileges. However, it cannot be argued that serious Constitutional issues of due process should be based on the question whether one is entitled to a cigarette or an additional shower.

■ Therefore, the Court finds that the rule of *Wolff v. McDonnell,* which requires due process in prison disciplinary action, applies to persons placed in administrative segregation in the Florida Penal System. "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The history of the application and administration of the due process clause leaves no doubt that the words of the Due Process Clause require that deprivation of life, liberty, property by adjudication or quasi-adjudication be preceded by notice and an

opportunity for hearing. See *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

It is also the rule of due process that flexibility is required in the application of the procedure. It appears from the cases decided on the point that timing and content of the notice and the nature of the hearing will depend on accommodation of the competing interests involved.

■ The prisoner's right to avoid segregation from the general prison population during the course of administrative investigations is not *de minimus,* therefore requiring at least minimal due process of notice in writing and an opportunity to be heard. Thus, under the Regulation and *Wolff,* plaintiff Parker was entitled to at least written notice and an opportunity to be heard. The degree of formality required in a prison disciplinary proceeding is based upon the potential consequences which the prisoner must face. Under Regulation 5.12(B)(2) the length of the investigative process is not limited in any way. The consequences of this open ended authority to segregate a prisoner are obvious, for which reason initial due process and periodic review are mandated.

■ Thus, the Court finds that the provisions of Regulation 5.12(A)(1) are inadequate when implementing Regulation 5.12(B)(2) and are violative of the due process clause of the Fourteenth Amendment. The regulation fails to meet the standards of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), when applied to the facts of this case.

■ Again, plaintiff seeks damages for the failure of the individual defendants to afford him his rights to due process. As discussed supra, the rule of *Procunier v. Navarette, supra,* precludes the recovery of damages unless the defendant knew or should have known that they were violating a protected right or unless the defendant acted with malicious disregard for the right.

■ The facts herein do not indicate that any of the defendants knew or should have known that the regulation in its then present form was unconstitutional, nor has it been shown that any of them acted maliciously toward the plaintiff.

## CONCLUSION

For the reasons stated in this Memorandum Opinion, plaintiff's prayer for money damages against each defendant shall be and is hereby denied.