Terrance MARIONEAUX, Robert Dotson and Martin Sargant, Jr., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The COLORADO STATE PENITENTIARY, William Wilson, Superintendent of the Maximum Security Facility of The Colorado State Penitentiary, Allen Ault, Executive Director of the Department of Corrections, and Albert Urie, Chairman of the Reclassification Committee, Defendants.

Civ. A. No. 78–K–1065.

United States District Court, D. Colorado.

Feb. 28, 1979.

**1246**

Jonathon B. Chase, University of Colorado School of Law, Boulder, Colo., Barbara Salomon, Holland & Hart, Denver, Colo., for the American Civil Liberties Union Foundation of Colorado, for plaintiffs.

Joseph N. de Raismes, Richard H. Goldberg, Asst. Attys. Gen., Denver, Colo., for defendants.

## TEMPORARY RESTRAINING ORDER

KANE, District Judge.

This is a class action brought pursuant to 42 U.S.C. § 1983 by three inmates at the Colorado State Penitentiary, Maximum Security Unit, Canon City, Colorado and on behalf of all other inmates similarly situated. Plaintiffs allege that the defendant state penitentiary and three of its administrative officers are placing inmates in punitive and administrative segregation without due process in violation of the Fourteenth Amendment of the United States Constitution. As relief, plaintiffs seek declaratory judgment, injunctive relief and monetary damages.

On December 7, 1978 plaintiffs filed a motion for a temporary restraining order as a result of certain actions taken by prison officials in response to a work stoppage at the penitentiary which began on October 30, 1978 when inmates housed in Cellhouse One refused to proceed to their work assignments and returned to their cells. Prison officials responded by locking all inmates in their cells. Between November 15 and 17, 1978, 21 inmates from Cellhouse One were transferred, without a hearing, to Cellhouse Three. In their motion plaintiffs allege that the initial lockdown constituted administrative segregation within the meaning of the Colorado State Penitentiary Code of Penal Discipline and the Manual and Policy on Classification and that defendant prison officials failed to comply with the procedures for transfer required by both the Code and the Manual. Further, plaintiffs allege that the transfer of 21 inmates from Cellhouse One to Cellhouse Three, without a hearing, constituted segregation and that defendants denied these inmates procedural due process guaranteed by the Code.

In their motion plaintiffs seek (1) an order terminating the unlawful segregation of inmates at the maximum security prison; (2) a restoration of the minimal benefits and privileges required by the Code; (3) a

release of all inmates in Cellhouse One from segregation; (4) the expungement from the records of all inmates in Cellhouse One of any record of any violation of the Code of Penal Discipline that was used as the basis for the present confinement in segregation in Cellhouse One; (5) the removal of 21 inmates from segregation in Cellhouse Three and their return to Cellhouse One; and (6) the expungement from the record of the 21 inmates of any record of any violation of the Code of Penal Discipline that was the basis for their present confinement in Cellhouse Three segregation.

Defendants rely on a Declaration of Emergency issued by Dr. Allen L. Ault, Director of the Department of Corrections as a basis for noncompliance with the Code and Manual by prison officials in response to the work stoppage. Notice of this declaration was given to prison staff members but not to inmates. Although no immediate action was taken on the first day of the work strike, Dr. Ault issued the following declaration on October 31, 1978, the second day the prisoners refused to work:

> "Due to mass disobedience by inmates at the Colorado State Penitentiary and potential violence caused by the disobedience I hereby declare a state of emergency.
>
> "All rules and procedures pertaining to due process in regressive moves and disciplinary procedures are hereby suspended."

This emergency order is apparently still in effect. In his affidavit in opposition to the motion, Dr. Ault states that he does not intend to recall the order until every individual inmate in Cellhouse One has been screened to his satisfaction.

In addition, defendants argue that the original twenty-four hour a day lockup of the inmates in Cellhouse One did not constitute segregation and, since the conditions of confinement in Cellhouse Three to which the 21 inmates were removed were no more restrictive than the conditions of confinement then existing in Cellhouse One, removal to Cellhouse Three could not be considered placement in segregation either.

This motion raises three important issues in regard to the constitutionality of the disciplinary actions taken by defendants in response to the work stoppage. First, what are the legal effects of the Code and Manual on prison disciplinary actions taken against inmates at the Colorado State Penitentiary? Second, can a declaration of emergency suspend the procedural safeguards guaranteed by the Code and Manual? Third, did a state of emergency exist on October 31 when the order was issued and if so, does an emergency continue to exist?

In recent Supreme Court decisions addressing the scope of procedural safeguards required by the Fourteenth Amendment when a prisoner is transferred to more restrictive conditions of confinement as punishment it has been held that the constitution does not require hearings or other notice "absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Thus, if state law creates procedural rights for inmates before they can be transferred to a more restrictive status, the constitution protects these rights rooted in state law:

> [A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of the government [citation omitted]. Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed. *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974).

Plaintiffs contend that the procedure outlined in the Colorado State Penitentiary Code of Penal Discipline and Manual and

Policy on classification creates a liberty interest under *Wolff, supra,* and that defendants' disregard of these procedures constituted a violation of the inmates' constitutionally protected rights.

Judge Arraj recently considered what procedural due process rights must be accorded Colorado State Penitentiary prisoners under the Fourteenth Amendment before they may be regressively classified and thereby transferred to more restrictive cellblocks in *Gurule v. Wilson,* Consolidated Civil Action No. 74–A–926, Memorandum Opinion and Order (D.Colo. April 3, 1978). In *Gurule* it was held that:

> * * * the Manual on inmate classification adopted by the Colorado Department of Corrections creates a liberty interest on the part of prisoners at the Colorado State Penitentiary. These prisoners are thus entitled to a hearing with certain procedural rights before they may be "regressively classified," as that term is defined in the Manual. Opinion, *supra,* at page 7.

*See also, Long v. Ault,* Civil Action No. 78–K–1165 (D.Colo. February 6, 1979).

■ I find this rationale persuasive. I find that the Manual and Code of Discipline clearly state that an inmate may not be regressively classified at the whim of prison officials nor as *ad hoc* punishment for alleged troublemakers.

■ Section 3 of the Code defines transfers to segregation in the following manner:

> There shall be two types of segregation: administrative and punitive. Segregation shall mean confinement in a secure location within the institution where the inmate's movement is restricted for up to 24 hours per day * * * Administrative segregation shall not be punitive in nature and shall not entail any additional loss of privileges, except those inherent for the protection of the inmate or others.

From the testimony presented at the hearing on the matter and from the affidavits submitted to the court, it is clear that inmates in Cellhouse One were segregated in response to the work stoppage on October 30, 1978. It is also clear that the 21 inmates transferred from Cellhouse One to Cellhouse Three between November 15 and 17 were also segregated as defined by the Code.

■ The next issue to consider is whether these inmates were afforded the due process safeguards guaranteed by the Manual. Section 6.2.3 of the Manual sets forth the procedure by which inmates may be subjected to segregated confinement:

> Confinement in administrative segregation may be ordered only by the Classification Committee, pursuant to these regressive classification procedures, unless a shift supervisor has reason to believe that an inmate must be immediately segregated to prevent or quell a riot, or to prevent property damage, injury to that inmate or others, or escape, in which case the shift supervisor may take the necessary steps to prevent injury or escape and immediately segregate the person. The shift supervisor must immediately submit a written request to the superintendent or assistant superintendent for transfer of the inmate to administrative segregation, stating the reasons for such transfer. Such transfers must be authorized or ratified in writing by the superintendent or assistant superintendent within 24 hours from the time of the transfer. The inmate's status shall then be reviewed at the next meeting of the Classification Committee or within 5 working days, whichever comes first.

The evidence presented shows that inmates were not treated according to the manual when they were transferred.

■ Defendants give two justifications for their failure to proceed according to the manual. First, they argue that the transfers were made as a result of a mass housing change in the maximum security facility. Such internal housing changes under § 4.9 of the manual will not normally be considered to be "regressive" necessitating procedural safeguards. Defendants, however, ignore § 5.1.2 of the same manual which states, "if there is doubt about the

substantive nature of a regressive change, the presumption shall be toward the use of the regressive classification procedures." Beyond question the transfers were in response to a work stoppage and Dr. Ault stated in his affidavit that the transfers were made in reaction to mass disobedience. Thus, I find defendants' reliance on the characterization of the transfers as merely housing reorganization unpersuasive, if not pretextual. The transfers were in fact regressive.

■ Next, defendants argue that their noncompliance with the manual was justified by Dr. Ault's declaration of emergency. Section 2(*1*)(1) of the Code provides for the restriction of inmate's rights and conditions of punishment upon the written order of the superintendent after the declaration of an emergency. However, § 3(a) of the Code sets forth without ambiguity the kinds of emergency conditions which must be present before an inmate may be transferred without an immediate hearing: riot, threat of property or physical injury or threat of escape. In his affidavit, Dr. Ault stated that at the time he issued the emergency order there had been no violence. In fact, the order was issued the day after the work stoppage commenced and thereby did not constitute an immediate response to a volatile condition. Moreover, Dr. Ault stated that "the emergency order was issued in order to give us latitude to move quickly when we received information or some "incident developed which might require that we separate some inmates from other inmates." (Ault affidavit at pages 4–5.) Thus, it is clear that the restrictions on plaintiffs were placed on them just in case something might happen.

Courts have generally held that due process does not require that a prison official wait for violence to erupt before being allowed to take action. *Hodges v. Klein*, 421 F.Supp. 1224 (D.N.J.1976), *aff'd* 562 F.2d 276 (3rd Cir. 1977). However, in cases where courts declined to second guess the declaration of emergency, the facts clearly demonstrated an immediate history of extreme prison violence that was absent when Dr. Ault issued his declaration. In contrast, where courts have found the absence of extreme conditions before the issuance of an emergency order, they have found prison official's actions to be an excessive reaction which placed intolerable constitutional burdens on inmates. *Jefferson v. Southworth*, 447 F.Supp. 179 (D.R.I.1978), is an example of the latter where the court found that inmates' refusal to work and unruly behavior of throwing food out of cells did not create an emergency condition and held that the indefinite lock up imposed as a response to this situation was unconstitutional.

In determining whether emergency conditions existed when the order was issued it is necessary to examine the reasons behind the work stoppage and if prison officials had a less restrictive alternative to deal adequately with the situation under the Code and Manual. Dr. Ault stated that he and other defendants initially believed that the purpose of the stoppage was to influence the state gubernatorial election by embarrassing the present administration and anticipated that it would end after the election. Thus, defendants decided to wait until after the election before imposing additional sanctions upon the disobedient inmates. Although the non-working inmates in Cellhouse One had already been placed in segregation, it was not until almost ten days after the election that inmates were formally charged with code violations for their refusal to work and for disobeying orders. During the entire time and to this date the emergency order continues to exist.

■ Since it has been demonstrated that extreme conditions did not exist at Canon City and that prison officials themselves in an exercise of their official discretion decided to take a wait and see approach, the only conclusion that can be reached is that Dr. Ault's declaration of emergency was an excessive reaction lacking in constitutional justification. Moreover, defendants had the remedies set forth in the code for taking immediate segregation of any inmate if one of the emergency factors became appli-

cable. It cannot be overemphasized that the Code and Manual created a constitutionally protected liberty interest in inmates that they would not be regressively classified except upon the occurrence of certain events which trigger certain procedural safeguards. This interest cannot be legally suspended except upon the existence of exigent circumstances. In the absence of this kind of circumstance, it is clear that defendants should have dealt with the situation as provided by Section 3 of the Code. It is therefore

ORDERED that plaintiffs' motion for temporary restraining order is granted and defendants are ordered to terminate the unlawful segregation of inmates at the maximum security prison. It is further

ORDERED that defendants restore the minimum benefits and privileges to inmates as required by the Code. It is further

ORDERED that defendants immediately cease segregating all inmates in Cellhouse One. It is further

ORDERED that defendants are prohibited from any use of inmate records of Code violations which resulted from the work stoppage until further order of this court. It is further

ORDERED that defendants remove the 21 inmates from segregation in Cellhouse Three and return them to Cellhouse One. It is further

ORDERED that defendants are prohibited from any use of inmate records of Code violations which were the basis for their confinement in Cellhouse Three segregation until further order of this court. It is further

ORDERED that defendants shall submit any proposed disciplinary or classification orders and future declarations of emergency with respect to any inmates in Cellhouse One segregation or the 21 inmates in Cellhouse Three segregation to the court. Where such change conflicts with this temporary restraining order such must receive prior approval of the court before being implemented.