**Claude H. JONES, et al., Plaintiffs,**

v.

**Jim J. MARQUEZ, Kenneth Oliver, and Robert Nye, Defendants.**

No. 78–3267.

United States District Court,
D. Kansas.

Oct. 26, 1981.

Stephen W. Kessler, Legal Service for Prisoners, Inc., Topeka, Kan., for plaintiffs.

Elsbeth D. Schafer, Asst. Atty. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the Court upon defendants' motions to dismiss and for summary judgment. Oral argument was heard on the motions, at which time counsel was appointed to represent plaintiffs, who had previously proceeded pro se. The respective parties were then given additional time in which to supplement the motions and respond thereto.

Having thoroughly examined all pleadings and materials in the file, and having considered oral argument, the Court is prepared to rule on defendants' motions. The undisputed facts appear to be as follows.

1. Plaintiffs at all times of the incidents complained of in this case, were inmates at the Kansas State Penitentiary at Lansing, Kansas.

2. During the week prior to August 18, 1978, an emergency situation developed at the institution. This emergency is described in the affidavit of Kenneth G. Oliver, Director, Kansas State Penitentiary, and is not disputed by plaintiffs:

"That the week preceding the date of August 18, 1978, on which 16 inmates named in this action were placed in Administrative Segregation, was a period of increased tensions brought about by the murder of two inmates, the murder of one correctional officer and the serious stabbing of another inmate all in separate, unrelated incidents. That there was reliable information that there were several handguns somewhere in the institution among the population. That a state of emergency was declared, the entire institution population were confined to their cells, the entire institution was searched and the inmates who were reportedly in possession of or had knowledge of the firearms were placed in Administrative Segregation due to the emergency situation and for further investigation."

3. On Friday, August 18, 1978, at approximately 3:00 p. m., plaintiffs were taken to the Adjustment and Treatment Building and placed in administrative segregation. Some plaintiffs attest that they were told they were being placed under "special security," some were questioned about the firearms, some were given form notices, and others were told nothing.

4. On Tuesday, August 22, 1978, each plaintiff was given a copy of the "Administrative Segregation Report," which stated that he was being held in administrative segregation under Rule 5–102 of the Kansas Department of Corrections' "Inmate Rule Book," pending investigation. The form report contained the signed approval of the shift supervisor. After the words "pending investigation" someone had typed "see attached." Plaintiffs state that the attached material was a Status Change Memo, dated August 23, 1978.

5. On August 23, 1978, the review board convened for hearings and each plaintiff was given the opportunity to challenge his placement in administrative segregation. Defendants exhibit copies of the initial review summary sheets which indicate that each plaintiff had the opportunity to submit a statement. A Status Change Memo dated August 23, 1978, clearly set forth the emergency conditions at the institution which triggered the lock-up, the reasons for plaintiffs being singled out and placed in administrative segregation, and the decision to continue to hold plaintiffs in segregation until the administration recommended their release or until the 30-day review, at which time the board might recommend release, for the stated purposes of recovering the firearms and protecting the inmate population.

6. Plaintiffs lodged this complaint after being confined in administrative segregation for one week.

7. On September 27, 1978, the case of each plaintiff remaining in segregation was

considered by the review board. The summary sheets of these hearings contain the recommendation that plaintiffs be released from administrative segregation on October 20, 1978, unless new information was uncovered.

8. Three loaded, commercially manufactured firearms were found in the Kansas State Penitentiary subsequent to the lock-down.

In general, plaintiffs complain that sufficient due process was not afforded in connection with the lock-down, that conditions of their confinement during the administrative segregation amounted to cruel and unusual punishment, and that they were denied adequate medical attention during this time. Plaintiffs were informed in the Court's Order of November 7, 1979, and during oral argument, that these claims were subject to summary dismissal unless the undisputed facts, as then perceived and set forth by the Court, were refuted and additional facts presented so as to state claims sufficient to warrant trial. The Court now scrutinizes each claim, mindful that it "should not be dismissed for failure to state a claim unless it appears beyond doubt plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and that the facts alleged by the party opposing the motions are to be taken as true.

The Court first addresses the claim that plaintiffs were denied due process prior to their transfer to administrative segregation. The general issue of what process is due prior to the intraprison transfer of an inmate has been determined in several recent cases and the analysis is generally two-pronged. The threshold inquiry is whether plaintiffs were vested with a protected liberty interest which required that certain due process standards be met prior to their transfer. If a liberty interest is found, then the next question is what process was constitutionally due plaintiffs before they were deprived of this protected liberty interest.

Plaintiffs claim a vested liberty interest in not being transferred to the more restrictive confinement of administrative segregation. They were held in administrative segregation from August 18, 1978, to various dates in September and October, 1978. Even though at that time *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), had established that a prisoner being deprived of a recognized liberty interest as a result of prison disciplinary proceedings is entitled to specific minimal procedural due process rights, it was uncertain whether *Wolff* applied to nonpunitive changes of status within a prison. *Lancaster v. Rodriquez*, No. 78–1811 (10th Cir. July 10, 1970, unpub.); *Raffone v. Robinson*, 607 F.2d 1058 (2d Cir. 1979). As pointed out in *Raffone*, the doubt arose from the United States Supreme Court's companion decisions in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), where it was held that the process protections were not triggered by a prisoner's transfer for either administrative or disciplinary reasons to another state prison where living conditions were substantially more restrictive, in the absence of a state law or practice conditioning such transfers upon the occurrence of specified events. The Court explained:

" . . . as long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."

*Montanye v. Haymes*, supra, at 242, 96 S.Ct. at 2547.

The Court also stated:

"Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is

transferred to the institution with the more severe rules."

.　.　.　.　.

"[T]o hold as we are urged to do that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano*, supra, 427 U.S. at 225, 96 S.Ct. at 2538. (Emphasis original).

Thus, the Court held that the federal Constitution does not, of itself, make a state prisoner's freedom from transfer to administrative segregation a protected liberty interest, but that such an interest may be created by state law. And when a protected liberty entitlement has been created by the State, the Due Process Clause insures that the right is not arbitrarily abrogated. *Meachum v. Fano*, supra; *Wolff v. McDonnell*, supra; *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980).

These state-created liberty interests may be derived from state statute, administrative rules or established practice. In the area of entitlements claimed by prison inmates, it has been held that liberty interests may be established by prison policy statements and regulations. *Bills v. Henderson*, supra; see also, *Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978).

Plaintiffs claim that contemporaneous prison regulations conferred upon them the right or expectation of not being placed in administrative segregation absent certain findings. By Kansas statute, the Secretary of the Kansas Department of Corrections has "authority at any time to transfer an inmate from one level of (security) status to another ..." and is to "adopt rules and regulations establishing standards relating to the transfer of an inmate from one status to another ..." K.S.A. § 75–5210(b) (1978, 1980 Supps.). Subsection (f) of § 5210 further provides:

"The Secretary shall adopt rules and regulations for the maintenance of good order and discipline in the correctional institutions, including procedures for dealing with violations. Disciplinary rules and regulations may provide a system of punishment including segregation, forfeitures of good time credits, fines, extra work, loss of privileges, restrictions and payment of restitution. A copy of the rules shall be provided to each inmate."

Rules and regulations with regard to maintenance of security and transfer to administrative segregation had been adopted and were in effect at the time of plaintiffs' transfers. The pertinent parts of those regulations, as exhibited by plaintiffs, are:

"5–101. There shall exist in each institution an area designated as Security Segregation which shall be a maximum security area. Such area shall be divided into two parts, one each for administrative and disciplinary segregation, whether such area be a physical building division or merely a division of procedures and conditions imposed upon the inmates held therein. Administrative segregation shall be for the incarceration of inmates for some necessary administrative purpose other than punishment.

5–102. Inmates confined in administrative segregation may be any of the following:

A. Protective Custody

.　.　.　.　.

B. Pending Investigation—Inmates may be placed in administrative segregation pending the completion of an investigation into some matter to determine whether charges should be brought. This may be done to prevent communication and collaboration between inmates involved in the matter to improperly or dishonestly coordinate the testimony which might be given, to prevent the possible intimidation of witnesses or accusers, *or to prevent further disruption if a threat to security and control, including danger to other inmates, continues to exist in the judgment of the director.* The inmate shall be charged or released as soon as

possible. The inmate may possibly be held in administrative segregation under both this section and Section V below simultaneously. This should be mentioned on the report form given to the inmate when he is placed in administrative segregation. The inmate shall be charged or released within seventy-two (72) hours, excluding Saturdays, Sundays, and holidays, unless a continued holding in administrative segregation under this section is justified in writing and approved by the director of the institution." (Emphasis added.)

C.   Pre-hearing Detention

.        .        .        .        .

D.   Communicable Disease

.        .        .        .        .

E.   Special Security Inmates as Follows:

.        .        .        .        .

5.   Emergency situation where the violent behavior of an inmate indicates that he is potentially dangerous to himself or others, but segregation in this case shall continue for the duration of the emergency only.

F.   Consistent Bad Behavior—Any inmate may be placed in Administrative Segregation indefinitely whose record shows consistent bad behavior as evidenced by finding of guilty by a disciplinary board of three offenses within nine months when such offenses are disruptive and threatening to the safety and security of the institution and when such offenses arise from separate fact situations.

5–103.   In all cases where inmates are placed in administrative segregation, the Shift Supervisor must give approval, and a written memorandum forwarded to the institution director by the Shift Supervisor before the end of that particular shift.

5–104.   An Administrative Segregation Report shall be completed in all cases indicating specifically which of the conditions is the reason for the placing of the inmate in administrative segregation.

5–105.   Inmates in administrative segregation shall be treated as nearly as possible like any other inmate in the general population of the institution. Where possible he shall retain such privileges and property as are commensurate with his particular condition for which he was placed in administrative segregation. Administrative segregation is not to be used or considered as punishment, and all time spent in administrative segregation shall be credited as time served on the inmate's sentence, or credited against his time in disciplinary segregation if a sentence of disciplinary segregation is imposed after a disciplinary board hearing.

5–106.   In cases involving suicide attempts, or attempts at arson, or other situations where, because the inmate in administrative segregation has access to devices with which to commit suicide, start fires, or otherwise threaten the safety of himself or others, he becomes an uncontrollable security risk, then in these cases the inmate may be immediately placed in greater restrictive confinement to prevent him from continuing to be a danger to himself or others. The inmate shall be given a written statement setting forth the reason why his status is being changed. In such cases the inmate shall be given appropriate due process including the charging with an offense and disciplinary hearing if appropriate, as quickly as possible within the rules so that his case may be clarified and his status be changed to disciplinary segregation under the disciplinary rules if appropriate. In such cases the inmate will be given a hearing before the Administrative Review Board within twenty-four (24) hours. Such hearing shall consist of the presentation by the inmate of his reasons for not having his status changed and the institution's reasons for the change of status. A written summary of the hearing shall be made. The change of status is for administrative security and control and does not constitute nor is it to be used as punishment.

.        .        .        .        .

5–108. In each institution there shall be an administrative segregation review board which shall consist of the following staff members at each institution:

—Officer in charge of segregation facility

—Chief of Clinical Staff or his designate

—Chief of Security or designatee

5–109 A. The administrative segregation review board shall convene no less than once each calendar month, except that it shall meet once a week to review those placed in administrative segregation within the preceding week, to review the status of each inmate confined in administrative segregation and to make written recommendations to the institution director for one of the following:

1. Continue in present status.

2. Return to general population.

3. Transfer to institution hospital for medical treatment.

4. Transfer to outside hospital for medical treatment or surgery.

5. Transfer to other Kansas state penal facility (including Honor Camps).

6. Transfer to KRDC for psychiatric evaluation.

7. Transfer to Larned State Hospital or other state institution for psychiatric diagnosis and treatment.

B. Administrative Review Board shall convene within one week excluding holidays and weekends after segregation of an inmate to hear the institution and the inmate present their respective testimony on a case upon incarceration of any inmate in administrative segregation. This shall apply to any case of administrative segregation including segregation pending hearing. in violation cases. The Review Board shall make a brief statement summarizing the position of both sides, and make a recommendation to the director to act or refrain from acting and the reasons for such recommendation. 5–110. Upon oral request of any inmate in Administrative Segregation, he shall be furnished a form # 9 and writing implement with which to make a written complaint to the Administrative Segregation Review Board concerning his condition or treatment. At least one member of the board shall make a weekly on site spot check, interviewing at least two inmates, to determine compliance with institution and department policy, rules and regulations."

█ Thus, even though Kansas prison officials have wide statutory discretion in making decisions as to administrative transfers, the prison rules, by specifically outlining the purpose of administrative segregation and recommending the general situations in which it would be appropriate, set bounds within which that discretion is to be exercised.

This Court held after trial in *Wright v. Lynch*, No. 78–3132 (D.Kan. January 21, 1981, unpub.), and reaffirms now, that these prison rules limit the discretion of prison officials in making decisions regarding administrative segregation and create a legitimate expectation on the part of Kansas inmates that they will not be transferred to administrative segregation absent a finding that such transfer is for one or more of the specified purposes. This holding is not disputed by defendants.

Since we have found a state-created liberty interest, we must now inquire as to what process was due plaintiffs before they were deprived of this protected interest and whether or not it was afforded in this particular case.

Plaintiffs contend that they were each entitled to all the procedural protections mandated for prison disciplinary actions in *Wolff v. McDonnell*, supra; that is, an opportunity to appear before the decision-making body; written notice of the charges in advance of the hearing; an opportunity to present witnesses and documentary evidence "when [it] will not be hazardous to institutional safety or correctional goals," 418 U.S. at 566, 94 S.Ct. 2979; a written statement of the reasons for the disciplinary action and of the evidence on which it is based; and if the inmate is illiterate or if the issues are complex, counsel substitute to

help him marshal evidence and prepare a defense. As support for this proposition, they cite *Enomoto v. Wright*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), which is the per curiam summary affirmance of a three-judge district court opinion published at 462 F.Supp. 397 (N.D.Cal. 1976). The district court held that statewide regulations limited the circumstances under which California inmates could be confined in maximum security for administrative reasons, and that they could not be so confined "unless they have been provided, minimally, with the safeguards required for such confinement for disciplinary reasons," at 403. This Court believes that the facts of the instant case call for less burdensome procedural safeguards. See *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980).

■ The question of what process is due in a certain factual situation is a legal one. See *Arsberry v. Sielaff*, 586 F.2d 37 (7th Cir. 1978). We are of the opinion that the distinction between administrative and punitive segregation may necessitate diverse procedural protections, particularly in the context of administrative detention for security purposes in an emergency situation. This theory was rationally applied in *Bills v. Henderson*, supra. The Circuit Court in that case found that a Tennessee inmate who is placed in administrative segregation due to his general behavior rather than an infraction of a specific prison rule is entitled to notice of the events triggering the transfer in advance of a hearing and a post-hearing, general statement of the reasons behind the transfer rather than a summary of the evidence relied upon.

Recognition of the different processes due is important for the reasons stated in *Bills v. Henderson*, and because it is necessary to preserve the discretion of prison officials to act on their rational "predictive judgment" that an emergency situation is impending which might be prevented through administrative detention. In a setting as volatile and potentially violent as a maximum security prison, it is essential that prison administrators retain their discretion to declare an emergency and secure those inmates believed to be a threat to order. See *Hayward v. Procunier*, supra; *Hoitt v. Vitek*, 497 F.2d 598, 601 (1st Cir. 1974); *Gilliard v. Oswald*, 552 F.2d 456, 459 (2d Cir. 1977).

It follows that the determination of what procedure is due is not as simple as extrapolating the process mandated for disciplinary proceedings by *Wolff v. McDonnell*, or requiring strict adherence to state procedural rules and regulations. Instead, this Court must apply the balancing test utilized in *Wolff v. McDonnell* to formulate the minimum due process required by the United States Constitution in this particular situation. See discussion in *Bills v. Henderson*, supra, at 1296–1299. The inquiry begins with "a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Morrissey v. Brewer*, 408 U.S. 471, at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484 (1972); *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

■ Prisoners have an interest in fair prison administration. Due process protection of liberty interests held by prisoners safeguard them from arbitrary government action. *Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977); *Wolff v. McDonnell*, supra, 418 U.S. at 558, 94 S.Ct. at 2975. In the prison setting, judgment on the constitutional issue of what process is due requires "an accommodation between the special needs of the prison institution and the provisions of the Constitution that are of general application." *Walker v. Hughes*, supra, at 1257, citing *Wolff v. McDonnell*, supra, 418 U.S. at 560, 562, 94 S.Ct. at 2976, 2977.

■ It has been established that the Due Process Clause affords fewer procedural rights to prison inmates charged with disciplinary infractions than to parolees in parole revocation hearings. It has also been held, and we agree, that prisoners administratively segregated, based upon the predictive judgment of prison officials in an emergency situation, may be entitled to fewer procedural rights than accorded in

prison disciplinary proceedings. *Gillard v. Oswald*, supra. However, some courts, as in *Wright v. Enomoto*, supra, have applied the *Wolff v. McDonnell* procedural standards to administration detention. Such cases generally contain a thorough discourse on the inmate's liberty interest with little or no balancing of that interest against asserted penal objectives. It may well be that these courts, without discussion, have found the penal objective to be either illegitimate or outbalanced. From this Court's review of the relevant case law it appears that several courts have been faced with the issue of what federal procedural rights are to be accorded inmates transferred to administrative segregation. Many cases have terminated with a finding that no liberty interest was created by state law so that no process was due; that process was due but none was afforded; or that the penological interest asserted by defendants to have justified summary deprivation of the prisoner's liberty interest was unsubstantial, even spurious or could have been realized without compromise to the inmate's rights. See, e. g., *Mitchell v. Hicks*, 614 F.2d 1016 (5th Cir. 1980); *Inmates v. Hall*, 550 F.2d 1291 (1st Cir. 1977); *Marioneaux v. Colorado State Penitentiary*, 465 F.Supp. 1245 (D.Colo. 1979); *Jefferson v. Southworth*, 447 F.Supp. 179 (D.R.I. 1978), aff'd. 616 F.2d 598 (1st Cir. 1980). No findings of this nature would be supported by the undisputed facts of this case. The penological objection of institutional security in the face of a genuine emergency which is in balance in this case is of the utmost importance and has not been refuted.

While the United States Supreme Court has stressed that convicted prisoners do not forfeit constitutional protections by reason of their confinement, the Court is equally emphatic that simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to justifiable restrictions and limitations. *Bell v. Wolfish*, 441 U.S. 520, at 545, 99 S.Ct. 1861, at 1877, 60 L.Ed.2d 447 (1979). The following citations from *Bell v. Wolfish* expound upon the penal interest that is to be accommodated with the inmate's interest in liberty:

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. *Price v. Johnston*, 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948); see *Jones v. North Carolina Prisoners' Labor Union*, supra [433 U.S. 119], at 125 [97 S.Ct. 2532, at 2538, 53 L.Ed.2d 629]; *Wolff v. McDonnell, supra* [418 U.S.], at 555; [94 S.Ct. at 2974]; *Pell v. Procunier*, supra [417 U.S. 817], at 822 [94 S.Ct. 2800, at 2804, 41 L.Ed.2d 495]. There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' *Wolff v. McDonnell*, supra [418 U.S.], at 556 [94 S.Ct. at 2975].

" 'Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' *Pell v. Procunier*, supra [417 U.S.], at 823 [94 S.Ct., at 2804]; see *Jones v. North Carolina Prisoners' Labor Union*, supra [433 U.S.], at 129 [97 S.Ct., at 2540]; *Procunier v. Martinez*, 416 U.S. 396, 412 [94 S.Ct. 1800, 1810, 40 L.Ed.2d 224] (1974). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoners' Labor Union*, supra [433 U.S.], at 129 [97 S.Ct., at 2540]; *Pell v. Procunier*, supra [417 U.S.], at 822, 826 [94 S.Ct. at 2804, 2806]; *Procunier v. Martinez*, supra [416 U.S.], at 412–414 [94 S.Ct., at 1810–1812].

Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union*, supra [433 U.S.], at 128 [97 s.Ct., at 2539]; *Procunier v. Martinez*, supra [416 U.S.], at 404–405 [94 S.Ct., at 1807–1808]; *Cruz v. Beto*, supra [405 U.S. 319], at 321 [92 S.Ct. 1079, at 1081, 31 L.Ed.2d 263]; see *Meachum v. Fano*, 427 U.S., at 228–229 [96 S.Ct., at 2540–2541]. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' *Pell v. Procunier*, 417 U.S., at 827 [94 S.Ct., at 2806]. We further observe that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of factin a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. *Procunier v. Martinez*, supra [416 U.S.], at 405 [94 S.Ct., 1807]; cf. *Meachum v. Fano*, supra [427 U.S.], at 229 [96 S.Ct., at 2540]." (Footnotes omitted.) (at 546–548, 99 S.Ct. at 1877–1879.)

■ We have established that plaintiffs had a state-created interest in not being transferred to administrative segregation absent certain factual findings and that such interest is to be protected from arbitrary abrogation by federal due process. We have also recognized the legitimate interest of the penal system in security. Balancing these two interests under the facts of this case we have determined that, at a minimum, plaintiffs were entitled to prompt notice of the reasons for their administrative transfer and an opportunity to challenge the action. However, we will not second guess the prison administration in their conclusion that the legitimate interest in security under the exigent circumstances presented here outweighed the plaintiffs' right to written notice in advance of the transfer. See *Bell v. Wolfish*, supra; *Hoitt v. Vitek*, supra. The notice given within 72 working hours as required by the Inmate Rule Book (Rule 5–102 B) and in advance of the hearings, adequately protected plaintiffs' interests while accommodating the demonstrated security interests of the institution. Accordingly, we hold that written notice of the grounds for placing an inmate in administrative segregation must be given to the inmate in order to inform him of the reasons for the action and to enable him to prepare a defense. It would be optional to provide this notice prior to an administrative transfer and sufficiently in advance of the hearing to permit preparation of a defense. However, the transfer to segregation may lawfully precede the hearing in the case of a genuine emergency. *Bills v. Henderson*, supra, at 1296, n.6; *Hayes v. Walker*, 555 F.2d 625 (7th Cir. 1977), cert. denied, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320. Were we to require that advance written notice containing a detailed statement of reasons precede every administrative transfer, the disturbance of breach in security which the administration hoped to prevent might instead be incited.

■ We further find that where administrative segregation results from an essentially predictive determination based upon the inmate's record that he is a threat to the security of the institution, it is not necessary to provide the inmate with a summary of the evidence relied on, as it is in a case where a determination of guilt is being made. *Bills v. Henderson*, supra; see also, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

In accord with *Bills v. Henderson*, this Court holds that in such a case it is sufficient for the review committee to provide the inmate with a post-hearing statement which contains a general account of the reasons underlying the transfer, including a description of the "triggering event" if one occurred, and which need not specify the evidence relied upon.

■ In the instant case it is not contested that a serious emergency existed at the time plaintiffs were placed in administrative segregation. Nor do plaintiffs dispute that they were significant individuals within the inmate hierarchy so that they might predictably be aware of or control the location of weapons within the prison. Prison officials made a predictive determination that having plaintiffs in general population at the same time as clandestine weapons posed a serious threat to the security of the institution. Plaintiffs were informed promptly and in advance of their hearings of this reason for their administrative transfers. The notice was sufficient to permit them to prepare objections. Each plaintiff was given the opportunity at his hearing to challenge the administrative action. Plaintiffs also received an adequate statement of reasons for the action which described the triggering event as the receipt of reliable information that weapons were hidden within the prison. Based upon these undisputed facts, we hold that plaintiffs' claims of inadequate notice and untimely hearings must be denied as a matter of law. Accordingly, summary judgment for defendants is appropriate.

■ Plaintiffs' substantive due process claim of having been placed and continued in administrative segregation for no valid reason is without merit. There is a sufficient administrative record to show that prison officials acted on a rational basis: concealed weapons were thought to be available to inmates and plaintiffs were those inmates believed most likely to exert control over such weapons. These inferences drawn from facts gathered by prison staff are not shown to be arbitrary or capricious. This is not altered by plaintiffs' allegation that the weapons were not discovered in the initial, massive search of the institution. The substantive due process review here is not whether this Court believes that weapons were in the prison and plaintiffs had control of them, but rather, whether the prison officials determination that plaintiffs' retention in general population constituted a threat to security was rational and whether it was an arbitrary or capricious act to place them in administrative segregation. This Court is firmly convinced that the action of the prison officials was not arbitrary or capricious and, therefore, finds no substantive due process violation. *Murphy v. Fenton*, 464 F.Supp. 53 (M.D. Pa. 1979).

■ Plaintiffs' allegations that the initial hearings and periodic reviews were "meaningless shams" are not supported by sufficient factual allegations. Although plaintiffs make conclusory statements with regard to their rights to an impartial hearing and to present evidence, no averment is made that any member of the review board was either a reporting or investigating officer, and no allegation is made that any evidence was proffered but refused. Furthermore, the entitlement to an "impartial" hearing body may be limited when the decision to segregate is made upon the administration's predictive judgment.

■ The right to cross-examine adverse witnesses, asserted by plaintiffs, is a matter left to the sound discretion of prison authorities. *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). No claim is made that cross-examination was requested but refused for arbitrary reasons. Conclusory allegations such as these are not deserving of further proceedings.

In summary, the Court holds that plaintiffs did have a state-created interest in not being transferred to administrative segregation absent certain conditions; that the requisite federal due process, which was not identical to that mandated for disciplinary proceedings in *Wolff v. McDonnell*, was satisfied under the undisputed facts of the

case; and that plaintiffs otherwise fail to state a substantial claim of denial of federal due process. It is therefore concluded that defendants' motion for summary judgment must be sustained on the claim of denial of due process.

■ We next examine plaintiffs' claim that they were subjected to cruel and unusual punishment as a result of the conditions of confinement in the administrative segregation unit. We hold that even considering plaintiffs' affidavits and exhibits as amendments to their complaints, the factual allegations contained therein do not present a substantial claim under the Eighth Amendment. Plaintiffs have all been released from the administrative unit. Consequently, their only remaining demand in this issue is for money damages. The deficiencies of this claim were delineated in our previous order. Nevertheless, in the complaint and subsequent filings no actual infringement of judicial access has been presented, and no compensable injury from insects, lack of outdoor exercise, or other temporary deprivation or condition endured by plaintiffs has been demonstrated. The conditions as described by plaintiffs, although harsh, cannot be termed "punishment ... involving the infliction of unnecessary and wanton pain." See *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); see also, *Hayward v. Procunier*, supra.

Moreover, there is no indication that any defendant maliciously or knowingly provided constitutionally inadequate cell blocks, denied accountrements, inhibited privileges for plaintiffs, or was directly responsible for their maintenance in such manner so that he might not be entitled to the qualified immunity from money damages enjoyed by prison officials. *Hoitt v. Vitek*, supra; *Parker v. Cook*, 464 F.Supp. 350 (S.D.Fla. 1979), *modified*, 642 F.2d 865 (5th Cir. 1981); see also *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Plaintiffs' general allegations that the totality of conditions in the Adjustment and Treatment unit are cruel and unusual without specifying that any

defendant caused it, or how any plaintiff was damaged by such conditions, are simply not sufficient. Accordingly, defendants' motion to dismiss shall be sustained on this claim.

■ Plaintiffs' claim of cruel and unusual punishment resulting from the denial of medical attention during their hunger strike also must fail. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, at 106, 97 S.Ct. 285, at 292, 50 L.Ed.2d 251 (1976). Defendants' motion for summary judgment on this claim is supported by competent prison infirmary records and affidavits indicating that routine and emergency medical attention was made available to and occasionally utilized by plaintiffs while they were in administrative segregation and refusing some meals. Plaintiffs do not adequately controvert these documents. See Rule 56, Federal Rules of Civil Procedure. In fact, no plaintiff even alleges or suggests that any specific request for medical attention was communicated but refused or ignored by defendants. Neither deliberate indifference nor the existence of serious medical needs has been presented.

For the foregoing reasons, it is determined that no material facts remain for trial; that defendants are entitled to judgment as a matter of law; that defendants' motion to dismiss should be granted on plaintiffs' claims of cruel and unusual punishment; and that defendants' motion for summary judgment should be granted on plaintiffs' claim of a denial of due process.

IT IS THEREFORE ORDERED that defendants' motions to dismiss and for summary judgment are hereby sustained; that this action be dismissed and all relief denied.